## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>IH 1, INC., *et al.*,<br><br>Debtors. | Chapter 7<br><br>Case No. 09-10982 (LSS)<br><br>(Jointly Administered) |
| GEORGE L. MILLER, in his capacity as Chapter 7 Trustee,<br><br>Plaintiff,<br><br>v.<br><br>KIRKLAND & ELLIS LLP,<br><br>Defendant. | Adv. Proc. No. 12-50713 (LSS)<br><br>**Re: Docket Nos. 67, 68, 69, 70, 72, 73, & 74** |

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW PURSUANT TO 28 U.S.C. §157(c)(1) AND FED. R. BANKR. P. 9033(a)

DILWORTH PAXSON LLP
Jesse N. Silverman, Esq.
One Customs House – Suite 500
704 King Street
Wilmington, DE 19801

- and -

Maura Fay McIlvain, Esq.
1500 Market Street, Suite 3500E
Philadelphia, PA 19102

Attorneys for George L. Miller,
Chapter 7 Trustee

FOX ROTHSCHILD LLP
Seth A. Neiderman, Esq.
Maura L. Burke, Esq.
919 N. Market Street, Suite 300
Wilmington, DE 19801

- and -

Abraham C. Reich, Esq.
Peter C. Buckley, Esq.
2000 Market Street, Twentieth Floor
Philadelphia, PA 19103

Attorneys for Kirkland & Ellis LLP

Before the Court is Kirkland & Ellis LLP's ("Kirkland") motion for summary judgment[1] on each count set forth in the complaint[2] filed by the chapter 7 trustee (the "Trustee") of the above-captioned debtors (collectively, the "Debtors" or "Indalex")[3] on May 14, 2012. Because the Court finds that each count in the Complaint is barred by the statute of limitations, the Motion is granted.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and (c)(1). Venue is proper in this Court pursuant to 28 U.S.C. § 1409. This is a non-core proceeding. In non-core proceedings, the bankruptcy court shall file proposed findings of fact and conclusions of law[4] unless the parties consent to the entry of a final judgment by the bankruptcy judge. Neither the Motion nor any of the briefing address whether the parties have consented to entry of a final judgment. And, notwithstanding Federal Rules of Bankruptcy Procedure 7008 and 7012, neither the Complaint nor Kirkland's answer contain the required statements that a proceeding is core or non-core, and if non-core, whether the pleader does or does not consent to the bankruptcy judge entering a final judgment. Further, this action was filed before Local Rule 7012-1 was enacted, thus the lack of such statements in the pleadings does not automatically waive the pleader's right to contest the entry of a final judgment by the bankruptcy court.[5] Under these circumstances and for this

---

[1] *Kirkland & Ellis LLP's Motion for Summary Judgment* (the "Motion") (Dkt. No. 68).

[2] *Complaint* (the "Complaint") (Dkt. No. 1).

[3] Throughout these Proposed Findings, the Court adopts the parties' parlance with respect to the term "Indalex" and uses that term to refer collectively to Indalex Holdings Finance, Inc. and its subsidiaries.

[4] 28 U.S.C. § 157(c)(1); Fed. R. Bankr. P. 9033(a).

[5] Del. Bankr. L.R. 7012-1.

Motion, the Court will not find that either the Trustee or Kirkland has knowingly and voluntarily consented (expressly or impliedly)[6] to the entry of a final judgment by the Court.

## STATEMENT OF FACTS AND BACKGROUND

The essential facts are undisputed.  On March 20, 2009 (the "Petition Date"), the Debtors[7] filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, the "Bankruptcy Code").  By order[8] entered on October 15, 2009, the Court converted these cases to cases under chapter 7, effective as of October 30, 2009.  On the effective date, the Trustee was appointed to administer the remaining assets of the Debtors' estates.[9]  Prior to conversion, the Debtors were the world's largest independent producer of soft aluminum alloy extrusion products and North America's second largest aluminum extruder.[10]

### A. Sun Capital Acquires the Indalex Operating Entities

In March 2005, Honeywell International, Inc. ("Honeywell") acquired debtor Indalex Inc. and its non-debtor affiliate Indalex Limited (collectively, the "Operating Entities") through Honeywell's purchase of Novar plc.[11]  Even then, Honeywell disclosed

---

[6] *Cf. Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 1932, 1948 (2015).

[7] The Debtors are:  IH 1, Inc. f/k/a Indalex Holdings Finance, Inc., IH 2, Inc. f/k/a Indalex Inc., IH 3, Inc. f/k/a Indalex Holding Corp., , IH 4, Inc., f/k/a Caradon Lebanon, Inc. and IH 5, Inc., f/k/a Dolton Aluminum Company, Inc.

[8] *Agreed Order Converting the Debtors' Chapter 11 Cases to Chapter 7 Cases Pursuant to 11 U.S.C. § 1112(b) and Reaffirming Rights Under Final Order (I) Authorizing the Debtors (A) to Obtain Post-Petition Financing Under 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364, 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral Under 11 U.S.C. § 363 and (II) Granting Adequate Protection Under 11 U.S.C. §§ 361, 362, 363 and 364* (Dkt. No. 702).

[9] On July 20, 2009, this Court approved the sale of substantially all of the Debtors' assets.  *See Order Pursuant to 11 U.S.C. §§ 105(a), 363(b), (f), (l) and (m) and 365, and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014: Authorizing and Approving (A) Acquisition Agreement, (B) Sale of Certain Assets Free and Clear of Liens, Claims and Interests, (C) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (D) Related Relief* (Dkt. No. 516).

[10] 7/20/05 Indalex Aluminum Solutions Group Memorandum (Dkt. No. 70 Defendant's Ex. 12).

[11] *Id.*

that it did not intend to keep the Operating Entities and expected to pursue strategic alternatives post-acquisition.[12] Shortly after the Honeywell acquisition closed, an affiliate of the private equity firm Sun Capital Partners, Inc. ("Sun Capital") expressed Sun Capital's interest in acquiring all of the stock of the Operating Entities or all, or substantially all, of their assets.[13] To facilitate a potential transaction, Sun Capital retained Kirkland as outside corporate counsel.[14]

Ultimately, Sun Capital decided to pursue a leveraged buyout of the stock of the Operating Entities and instructed Kirkland to form two holding companies, Indalex Holding Corp. ("Indalex Holding") and Indalex Holdings Finance, Inc. ("Indalex Finance," and together with Indalex Holding, the "Holding Entities"), to complete the transaction.[15] On September 16, 2005, Indalex Holding entered into a stock purchase agreement with Honeywell.[16] Once the deal closed, Sun Capital would control Indalex Finance, which would own 100% of Indalex Holding's stock, and Indalex Holding would, in turn, wholly own the Operating Entities.[17]

In connection with the acquisition, Kirkland performed a variety of legal services for Sun Capital including drafting certain key financing documents.[18] Among those documents was a bond offering memorandum (the "Offering Memorandum"), by which Sun Capital,

---

[12] *Id.*

[13] 8/12/2005 E-Mail from D. Gessner re: "Sun/Indalex Diligence" and Attachments, Ex. 3 to *Plaintiff's Opposition to Defendant's Motion for Summary Judgment* ("Answering Brief") (Dkt. No. 73).

[14] 2/2/2006 Kirkland Statement of Legal Services Rendered (Dkt. No. 73 Plaintiff's Ex. 5).

[15] *See* Declaration of Timothy R.J. Stubbs in Support of Chapter 11 Petitions and First Day Relief (Dkt. No. 70 Defendant's Ex. 72); Acquisition Summary Indalex Holding Corp. (Dkt. No. 70 Defendant's Ex. 24).

[16] 9/16/2005 Stock Purchase Agreement (Dkt. No. 73 Plaintiff's Ex. 4).

[17] Offering Memorandum (Dkt. No. 70 Defendant's Ex. 23).

[18] 2/2/2006 Kirkland Statement of Legal Services Rendered (Dkt. No. 73 Plaintiff's Ex. 5); Select Pages of Transcript of Deposition of Carol Anne Huff Dated 5/28/14 (Dkt. No. 70 Defendant's Ex. 13).

though the newly-formed Indalex Holdings, would offer up to $270 million in secured debt financing to partially fund the purchase.[19]  JP Morgan, Harris Nesbitt, Credit Suisse, Morgan Joseph and Piper Jaffray were the initial purchasers of the notes issued by Holdings (the "11.5% Notes due 2014") and were represented by Cravath, Swain & Moore LLP.[20] The final Offering Memorandum was circulated to prospective investors on January 30, 2006.[21]  The debt offering raised about $268 million in capital[22] and three days later, on February 2, 2006, the acquisition closed for a purchase price of approximately $425 million plus fees and expenses of $23 million (the "Acquisition").[23]  Sun Capital financed the remainder of the purchase price through a $111.3 million equity contribution and borrowings on a revolver.[24]

### B. Investment in Sun Capital Funds

Relevant to the parties' briefing on the Motion, the Offering Memorandum disclosed in its "Legal matters" section that "[s]ome of the partners of Kirkland & Ellis LLP are partners in a partnership that is an investor in one or more of the investment funds affiliated with Sun Capital Partners that may purchase common stock of Indalex parent in connection with the Acquisition."[25]  While the Court cannot (and need not) determine why that disclosure was made, it reflects what will be referred to in these Proposed Findings as the "Alleged Investment Conflict."

---

[19]  Offering Memorandum (Dkt. No. 70 Defendant's Ex. 23).
[20]  *Id.* at A412–13, A630.
[21]  *Id.*
[22]  Acquisition Summary Indalex Holding Corp. (Dkt. No. 70 Defendant's Ex. 24).
[23]  Complaint ¶ 21; *Memorandum of Law in Support of Kirkland & Ellis LLP's Motion for Summary Judgment* 9 ("Memorandum in Support of Summary Judgment") (Dkt. No. 69) (citing Complaint).
[24]  Acquisition Summary Indalex Holding Corp. (Dkt. No. 70 Defendant's Ex. 24).
[25]  Offering Memorandum 210 (Dkt. No. 70 Defendant's Ex. 23) at A630.

Mr. Jack Levin, Kirkland's Rule 30(b)(6) designee, testified as follows. Since the 1980s, a group of Kirkland partners have created investment funds to make investments alongside Kirkland's private equity clients, such as Sun Capital. The firm, itself, has never invested in these funds, which it terms "PEFs" for Private Equity Funds. Each partner determines whether and in what amount he will invest in any given PEF, which invests only after a client invites it to do so. A management committee of Kirkland partners manages the PEFs. The management committee determines how the PEF will invest its committed capital. Once the capital is committed to a private equity fund, the management committee does not direct the fund or know what portfolio company its client's fund will acquire. Accordingly, when an individual partner commits capital to a PEF, he does not know in what client fund it will ultimately be invested.[26]

Two PEFs in which Kirkland Partners invested, namely: (i) K&E Investment Partners, LLC – 2003 PEF (the "2003 PEF") and (ii) K&E Investment Partners, LLC – 2005 PEF (the "2005 PEF") invested in Sun Capital Partners III, QP LP ("Sun III") and Sun Capital Partners IV, LP ("Sun IV") respectively. Sun Capital employed funds from Sun III and Sun IV as part of the $111.3 million equity investment in Indalex.[27]

### C. Indalex Hires Kirkland

Upon the closing of the transaction, and at all relevant times following the Acquisition, Sun Capital controlled Indalex, which was now one of Sun Capital's portfolio

---

[26] Select pages of Transcript of Deposition of Jack Levin, (Dkt. No. 70 Ex. 1).

[27] Acquisition Summary Indalex Holding Corp. (Dkt. No. 70 Defendant's Ex. 24). Certain specifics of the investments, such as the amount invested by Kirkland partners in each PEF, the percentage of the PEF invested in a Sun Capital fund and the total capital of each Sun Capital fund were redacted from the submissions in the public record. As they are not relevant to the rulings in this case, the Court has not disclosed this information.

companies.[28]  Contemporaneous with the closing of the Acquisition, Indalex retained

Kirkland as its general outside counsel.[29]  The executed engagement letter contemplated

Kirkland providing a variety of legal services to Indalex, including legal advice on corporate

transactional matters.[30]  The letter also specifically informed Indalex that Kirkland

represented Sun Capital—including with respect to Sun Capital's ongoing investment in

Indalex—and that Kirkland anticipated it would continue to do so in the future.[31]  Kirkland

also sought and obtained a purported waiver from Indalex of past, present, and future

conflicts arising from Kirkland's representation of Sun Capital.[32]  Part of the agreement was

an understanding that, in the event Kirkland or Sun Capital determined a conflict existed,

Kirkland could terminate its representation of Indalex and continue that of Sun Capital.[33]

The engagement letter did not, however, disclose the Alleged Investment Conflict.

---

[28] Indalex Holdings Finance, Inc. Form 10-K for the Year Ended December 31, 2007 (Dkt. No. 70 Defendant's Ex. 55).

[29] Kirkland Engagement Letter (Dkt. No. 70 Defendant's Ex. 31).

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] *Id.*  The full disclosure regarding Kirkland's dual representation of Sun Capital and Indalex is as follows:

> As you know, we have represented and represent Sun Capital Partners, Inc. and its affiliated investment funds and management companies (together, "Sun") on a variety of matters, including Sun's investment in you and anticipate that we will represent Sun in future matters. You are a portfolio company of Sun. This confirms that K&E LLP has informed you of its representation of Sun on a variety of matters, including Sun's investment in you, and that you consent to, and waive any conflict or other objection with respect to K&E LLP's representation of Sun, its affiliates or portfolio companies in connection with any and all (i) matters in which K&E LLP currently represents Sun, its affiliates or portfolio companies, including the Indalex Matters, (ii) past matters in which K&E LLP represented you, Sun, Sun's affiliates or Sun's portfolio companies (or any combination thereof) and (iii) future matters in which K&E LLP might represent Sun (whether or not such matter is related to the Indalex matters). You also agree that K&E LLP's representation is solely of you, and no other person (other than Sun) has the status of a client for conflict of interest purposes in connection with the Indalex Matters. In addition, you understand and agrees [sic] that in the event that K&E LLP or Sun determine that any conflict exists in connection with K&E LLP's representation of you, K&E LLP may terminate its

### D. Indalex Issues a Significant Dividend to Its Ultimate Stockholders, Including Sun Capital

When Sun Capital acquired Indalex Limited, its non-operating subsidiary Indalex UK Limited ("Indalex UK") held an approximate 25% ownership interest in Asia Aluminum Group Limited ("AAG"), a Chinese aluminum extruder.[34] At the time of the Acquisition, it was expected that Indalex UK would subsequently sell that interest and declare an upstream dividend.[35] Consistent with that expectation, in May 2007, fifteen months after the Acquisition, Indalex UK sold the minority interest for approximately $153 million.[36]

Upon receipt of the funds, Indalex Limited promptly transferred the entire amount to Indalex Inc., its "brother" entity.[37] Indalex Inc. immediately directed a return wire of $31 million, leaving Indalex Inc. with approximately $122 million of additional capital from the sale, despite Indalex Inc. having had no prior interest in AAG.[38] Indalex Inc. thereafter paid Sun Capital approximately $1.5 million in transaction fees and transferred

---

representation of you and continue its representation of Sun in any matter (whether or not such matter is related to the Indalex Matters). All files relating to Sun, its affiliates or portfolio companies will be kept confidential and unavailable to you. In addition, we will not be obligated to disclose to you any confidential information of Sun, its affiliates or portfolio companies that K&E LLP learns in the process of representing Sun, its affiliates or portfolio companies.

*Id.* at A1841.

[34] Indalex Holdings Finance, Inc. Form 10-K for the Year Ended December 31, 2006 (Dkt. No. 70 Defendant's Ex. 54); Select Pages of Transcript of Deposition of Michael Alger Dated 4/26/12 (Dkt. No. 70 Defendant's Ex. 33).

[35] Sun Adversary Complaint ¶ 113 (Dkt. No. 70 Defendant's Ex. 25); 2/2/06 Indenture (Dkt. No. 74 Defendant's Ex. 82).

[36] *See* 5/31/07 Blocked Analyzed Checking Statement for Indalex Inc. (Dkt. No. 73 Plaintiff's Ex. 29).

[37] *Id.*

[38] *Id.*

approximately $75.5 million to the bond trustee for the 11.5% Notes due 2014 for an anticipated bond redemption offer.[39]

Around the time of the sale, Indalex Finance and Indalex Holding engaged FTI Capital Advisors, LLC ("FTI")—at the direction of Sun Capital—to analyze the solvency and financial condition of those entities immediately following a combined dividend and debt repayment (i.e., bond redemption) transaction.[40]  In particular, FTI was asked to perform an analysis and assume that Indalex UK would sell its 25% interest in AAG, and that Holdings and Finance would use the proceeds to offer to repurchase up to $75.5 million of the 11.5% Notes due 2014 and to make a stockholder distribution (i.e. dividend) of approximately $76.6 million.[41]  In the report, FTI was asked to address whether after that transaction: (i) the fair market value and the present saleable value of Holdings and Finance's assets would exceed their stated liabilities and contingent liabilities; (ii) Holdings and Finance would be able to pay their debts as they become due; and (iii) the capital remaining in Holdings and Finance would be unreasonably small for their business as it was then conducted.[42]

On June 1, 2007, after incorporating several modifications negotiated by Sun Capital and Kirkland, FTI issued its final report (the "FTI Report").[43]  The modifications requested by Kirkland included changes reflecting Kirkland's desire that the report mirror and cite to applicable Delaware General Corporation Law and/or Delaware's fraudulent conveyance

---

[39] *Id.* Indalex Inc. also paid approximately $3.1 million in bond interest once the bonds were actually redeemed.
[40] 5/14/07 FTI Engagement Letter (Dkt. No. 70 Defendant's Ex. 40).
[41] *Id.*; 6/1/07 Final FTI Report (Dkt. No. 70 Defendant's Ex. 35).
[42] FTI Engagement Letter (Dkt. No. 70 Defendant's Ex. 40).
[43] Final FTI Report (Dkt. No. 70 Defendant's Ex. 35); Emails from Steven Liff and Jeremy Liss re: FTI Report (Dkt. No. 73 Plaintiff's Exs. 44 and 45).

statute.[44] Some comments were accepted; others did not make their way into the FTI

Report.[45] Additionally, the day before FTI's report was due, Sun Capital specifically

threatened to pull the work from FTI and give it to another firm if FTI could not make

certain specified changes to its report.[46] Kevin Schultz of FTI testified, in passing, to

"harassment" related to getting the FTI Report out.[47] But, Richard Braun of FTI testified

that the requested changes did not affect the conclusions reached by FTI, and that FTI

stands behind its work and the FTI Report.[48] In any event, FTI issued its report.

     As part of the process, the Debtors asked Kirkland whether Indalex UK also needed

to receive the benefit of the FTI analysis.[49] Kirkland advised the Debtors that there was no

need for FTI to analyze the financial condition of that entity because interim financials

already existed showing Indalex UK to have sufficient "distributable reserves" under UK

law to complete the transaction.[50] As part of that process, Kirkland also drafted and

counseled Indalex on the corporate consents (the "Consents")[51] needed to consummate the

distribution of funds.

     Also on June 1, 2007, Indalex issued an approximate $76.6 million dividend (the

"Dividend") to its ultimate stockholders, the largest of which was Sun Capital.[52] Numerous

Kirkland partners also received a distribution through their indirect investments in Sun III

and Sun IV.[53] Later that month, as the second phase of the transaction, nearly $75.5 million

---

[44] Email from Brandon Smith re: K&E Comments to FTI Report (Dkt. No. 70 Defendant's Ex. 48).
[45] *See* Final FTI Report (Dkt. No. 70 Defendant's Ex. 35).
[46] Email from Steven Liff re: FTI Report (Dkt. No. 73 Plaintiff's Ex. 44).
[47] Excerpt of Transcript of Deposition of Kevin Shultz (Dkt. No. 73 Plaintiff's Ex. 43).
[48] Select Pages of Transcript of Deposition of Richard Braun (Dkt. No. 70 Defendant's Ex. 44).
[49] Email from Ted Frankel re: FTI Proposal Letter (Dkt. No. 73 Plaintiff's Ex. 32).
[50] *Id.*
[51] Email from Ted Frankel re: Board Consents to AAG Dividend (Dkt. No. 73 Plaintiff's Ex. 31).
[52] *See* 6/29/07 Analyzed Checking Statement for Indalex Inc. (Dkt. No. 73 Plaintiff's Ex. 29).
[53] *See, e.g.*, Memorandum in Support of Summary Judgment 9.

previously transferred to the bond trustee was used to retire tendered bonds at a 5% premium.[54]

Shortly after the Dividend, Indalex filed its Form 10-Q with the United States Securities and Exchange Commission (the "SEC") for the quarter ended July 1, 2007 (the "July 10-Q").[55] The consolidated balance sheet included shows Indalex Inc. having liabilities that exceeded its assets by more than $33.7 million.[56] The same chart included in Form 10-Q for the quarter ended April 1, 2007 (the "April 10-Q"), indicates that the company's assets—prior to the Dividend—exceeded its liabilities by over $47.7 million.[57]

### E. The Trustee Commences Litigation Against Sun Capital and Kirkland

On March 20, 2009, nearly two years after Indalex declared the Dividend, the instant bankruptcy cases were filed. Following conversion of the cases to chapter 7, the Trustee commenced an adversary proceeding against Sun Capital and others, including officers and directors of Indalex (the "Sun Adversary"),[58] alleging, *inter alia*, that Sun Capital exercised its control of Indalex to improperly extract money from the company by way of the Dividend.[59] The Trustee further alleges that the Dividend rendered Indalex insolvent, and

---

[54] July 10-Q (defined below).

[55] Indalex Holdings Finance, Inc., Quarterly Report for the Period Ended July 1, 2007 (Form 10-Q) (Aug. 10, 2007) (Dkt. No. 70 Defendant's Ex. 50).

[56] *Id.* at 28, A2019.

[57] Indalex Holdings Finance, Inc., Quarterly Report for the Period Ended April 1, 2007 (Form 10-Q) 27 (May 18, 2007),
https://www.sec.gov/Archives/edgar/data/1351667/000110465907041485/a07-12625_110q.htm.
Review of the April 10-Q is proper under the Court's judicial notice authority. Federal Rule of Evidence 201(b), (c)(1) & (d). The Court is not taking judicial notice for purposes of the truth of the matters asserted, only for the fact of what is stated in the report.

[58] *Miller v. Sun Capital Partners, Inc.*, Adv. Proc. No. 10-52279 (Bankr. D. Del), subsequently withdrawn by the Delaware District Court and docketed as *Miller v. Sun Capital Partners, Inc.*, Case No. 13-1996-RGA (D. Del).

[59] 7/30/10 Sun Adversary Complaint (Dkt. No. 1, Adv. Proc. No. 10-52279; Dkt. No. 70 Defendant's Ex. 25).

therefore moved to recover against Sun Capital and the individual defendants for breaches of their fiduciary duties.[60]

Eight months after initiating the Sun Adversary, the Trustee asked Kirkland to enter into a tolling agreement (the "Tolling Agreement") with respect to any claims the Trustee may have against Kirkland arising out of Kirkland's representation of Indalex. Kirkland agreed and on March 14, 2011, the Tolling Agreement was executed.[61] The Tolling Agreement specifically provided that any statute of limitations applicable to the Trustee's potential claims against Kirkland was "tolled from [March 14, 2011] through and including the earlier of (a) one year from [March 14, 2011] (subject to renewal as and when agreed by the parties) or (b) sixty (60) days following the termination of this Agreement in accordance with the provisions of paragraph 4 [of this Agreement]."[62] Although the Trustee "disagrees" with Kirkland over the effect of the Tolling Agreement, he also does not contend that termination or renewal occurred as provided by the agreement.[63] Accordingly, the Tolling Agreement expired on March 14, 2012.

The Trustee claims that he first learned of potential causes of action against Kirkland while taking discovery in the Sun Adversary. Specifically, the Trustee asserts that an April 17, 2012 deposition of Sun Capital co-founder Marc Leder revealed for the first time that Kirkland held disabling conflicts of interest by virtue of its partners' investments in the 2003 PEF and the 2005 PEF, which invested in Sun III and Sun IV. According to the Trustee, nothing prior to this revelation signaled any wrongdoing by Kirkland.

---

[60] *Id.*
[61] 3/4/11 Tolling Agreement (Dkt. No. 70 Defendant's Ex. 62).
[62] *Id.* ¶ 1, at A2939.
[63] *See* Answering Brief 16 n.10.

The Trustee thereafter initiated this adversary proceeding by filing the Complaint on May 14, 2012. The Complaint contains two separate counts: Aiding and Abetting Breach of Fiduciary Duty and Professional Negligence. In response, Kirkland moved to dismiss the Complaint on the basis that the Trustee's claims were time-barred by the relevant statutes of limitation. The Court denied that motion, finding, based solely on the allegations in the Complaint,[64] that the statute of limitations was tolled because the Alleged Investment Conflict was not discovered until the Leder deposition.[65] The Complaint, filed twenty-seven days later, was therefore timely, at least upon the limited review appropriate at the motion to dismiss stage.[66] Put differently, a dispositive ruling was premature, assuming the Trustee only came to have notice—or could be deemed to have notice—of his claims less than a month before filing the Complaint.

Fact discovery in this matter concluded on October 13, 2014, and expert discovery closed on May 15, 2015.[67] Per the Court's scheduling order, the Trustee was required to designate all of his experts and serve copies of their initial reports by November 13, 2014.[68] To date, the Trustee has only designated an expert to address his legal malpractice claims.

---

[64] "To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014).

[65] *See Letter Ruling Dated October 2, 2012 Denying Kirkland & Ellis LLP's Motion to Dismiss the Trustee's Complaint* 7 (the "Letter Ruling") (Dkt. No. 20) ("*According to the Complaint*, the Trustee on April 17, 2012 first learned from a Sun Capital Partners insider that [Kirkland] had a conflicting interest in the dividend transaction.") (emphasis added). Relying on the Complaint, the Court did not analyze whose knowledge was relevant in a statute of limitations analysis. *See* discussion *infra* Section II.

[66] *See id.*

[67] *Order Approving Stipulation Regarding Sixth Amended Scheduling Order* (the "Sixth Amended Scheduling Order") (Dkt. No. 55); *Order Approving Stipulation Regarding Eighth Amended Scheduling Order* (Dkt. No. 62).

[68] Sixth Amended Scheduling Order.

No expert has been put forth on the insolvency issue.  Following discovery, Kirkland filed the Motion now under consideration.

**The Parties' Positions**

Kirkland supports its request for summary judgment with three principle arguments: (1) both of the Trustee's claims are time-barred in light of evidence not adduced at the motion to dismiss stage; (2) the Trustee cannot establish insolvency without an expert, nor can he prove that Kirkland knew Indalex fiduciaries would breach their duties by issuing the Dividend, and thus the aiding and abetting count cannot survive; and (3) the Trustee cannot establish legal malpractice without an expert on the appropriate standard of care.

In response, the Trustee argues that the Court already addressed the issue of timeliness.  Specifically, the Trustee claims that the Court's prior ruling on the motion to dismiss is law of the case, and therefore the Court must reject the renewed limitations argument at this stage.  Alternatively, the Trustee posits that the statutory periods never expired because they were tolled under the doctrines of fraudulent concealment and equitable tolling.

As to the aiding and abetting claim, the Trustee's position is that, by moving to stay this case pending a disposition in the Sun Adversary, Kirkland agreed to be bound by any ruling in that proceeding on the underlying fiduciary duty issues.  Similarly, the Trustee insists that the law of the case principle dictates preclusion of summary judgment in Kirkland's favor, to the extent the Court determined summary judgment was inappropriate in the Sun Adversary.  The Trustee further asserts that not all of the fiduciary duty claims in the Sun Adversary, and therefore not all of the aiding and abetting claims here, depend on solvency, despite the Complaint referencing insolvency as the only ground for the alleged

fiduciary breaches.  In any event, the Trustee believes that there is ample evidence—in this case—supporting the underlying breaches and Kirkland's knowing participation.

Lastly, with respect to the alleged malpractice, the Trustee contends that this is "the classic case of dueling experts" who disagree on whether Kirkland comported with the applicable standard of care, and thus summary judgment is inappropriate.  However, rather than explain how the ethical rules and Kirkland's prior advice comprise the standard of care, the Trustee largely attacks the credibility of Kirkland's experts[69] and alleges that certain corporate documents drafted by Kirkland contained false representations.

## SUMMARY JUDGMENT STANDARD

The Court must grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[70]  "Although questions of negligence are usually reserved for the factfinder, summary judgment is proper where the facts are undisputed and only one conclusion may reasonably be drawn from them."[71]  Unlike the motion to dismiss stage, the Court is not limited to the complaint and documents referenced therein, but may appropriately consider the pleadings, admissible discovery, affidavits and disclosure materials on file.[72]  Importantly, when considering the facts before it, the Court must view

---

[69] For example, the Trustee devotes nearly an entire page of the Answering Brief to criticizing the manner in which Kirkland's proffered experts undertook their respective conflict checks.

[70] Fed. R. Civ. P. 56(a) (applicable to adversary proceedings by Fed. R. Bankr. P. 7056).

[71] *Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir. 1985) (quoting *Flying Diamond Corp. v. Pennaluna & Co.*, 586 F.2d 707, 713 (9th Cir. 1978)); *see also Liquidating Tr. of U.S. Wireless Corp. (In re U.S. Wireless Corp.)*, 386 B.R. 556, 559 (Bankr. D. Del. 2008) ("Summary judgment is designed 'to avoid trial or extensive discovery if facts are settled and dispute turns on [an] issue of law.'"  As such, "summary judgment's operative goal is 'to isolate and dispose of factually unsupported claims or defenses' in order to avert 'full-dress trials in unwinnable cases . . . .'").

[72] *See* Fed. R. Civ. P. 56(c).

the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in favor thereof.[73]

Summary judgment will not be granted if the parties genuinely dispute an issue of material fact.[74] A material fact is one which could alter the outcome of the case.[75] A genuine dispute is "present when the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[76]

If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, "the burden of proof is switched to the non-movant who must present definite, competent evidence to rebut the motion."[77] Put differently, "the non-moving party must adduce more than a mere scintilla of evidence in its favor" and "cannot simply reassert factually unsupported allegations contained in its pleadings."[78] Similarly, where the nonmoving party completely fails to adduce evidence concerning an essential element of its case, summary judgment must be entered in favor of the moving party.[79]

---

[73] *Young v. Pennsauken Twp. Sch. Dist.*, 47 F. App'x 160, 161 (3d Cir. 2002) (per curiam); *U.S. Wireless*, 386 B.R. at 560.

[74] *U.S. Wireless*, 386 B.R. at 559.

[75] *Id.* at 560.

[76] *Dembsky v. Frommer, Lawrence & Haug, LLP (In re Lambertson Truex, LLC)*, 458 B.R. 155, 158 (Bankr. D. Del. 2011).

[77] *Delta Mills, Inc. v. GMAC Commercial Fin. LLC. (In re Delta Mills, Inc.)*, 404 B.R. 95, 105 (Bankr. D. Del. 2009) (quoting *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991)).

[78] *Id.*; *see also Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014) ("[M]ere allegations are insufficient, and only evidence sufficient to convince a reasonable factfinder to find all of the elements of the prima facie case merits consideration beyond the Rule 56 stage." (quoting *Lauren W. v. DeFlaminis*, 480 F.3d 259, 266 (3d Cir. 2007))).

[79] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Freeman v. Miller*, 615 F. App'x 72, 75 (3d Cir. 2015) (per curiam); *Delta Mills*, 404 B.R. at 105.

## ANALYSIS

### I.   The Law of the Case Doctrine Does Not Preclude Summary Judgment on Either Count

The law of the case doctrine states that a prior legal determination "should continue to govern the same issues in subsequent stages [of] the same case."[80]  When a successor judge inherits a matter, he should not "lightly overturn decisions of his predecessors"[81]  A court should only revisit matters decided earlier in a case if, for example, new evidence is available, supervening new law is handed down, or the previous decision is "erroneous and would create manifest injustice."[82]  But, the doctrine is not an absolute bar to rehearing a matter; rather, it "merely directs the court's discretion not to rehear matters *ad nauseam*."[83]  It should be evident that the doctrine only applies to issues that have been actually determined.[84]

Moreover, unlike decisions rendered after an opportunity for an evidentiary showing, the doctrine does not provide deference to rulings made on motions to dismiss.[85]  Specifically, the doctrine "does not preclude a grant of summary judgment in favor of a

---

[80]  *Arizona v. California*, 460 U.S. 605, 618 (1983), *reh'g denied*, 462 U.S. 1146 (1983) (citing 1B JAMES WM. MOORE & THOMAS S. CURRIER, MOORE'S FEDERAL PRACTICE ¶ 0.404 (2d ed. 1982)); *see also Ogbudimkpa v. Ashcroft*, 342 F.3d 207, 210 n.7 (3d Cir. 2003) (stating that "once an issue has been decided, parties may not relitigate that issue in the same case.").

[81]  *Tse v. Ventana Med. Sys., Inc.*, 123 F. Supp. 2d 213, 221 (D. Del. 2000) (citing *Fagan v. City of Vineland*, 22 F.3d 1283, 1290 (3d Cir. 1994)).

[82]  *Id.* (citing *Schulz v. Onan Corp.*, 737 F.2d 339, 345 (3d Cir. 1984)).

[83]  *Philip Servs. Corp. v. Luntz (In re Philip Servs. (Del.), Inc.)*, 267 B.R. 62 (Bankr. D. Del. 2001) (citing *Arizona v. California*, 460 U.S. at 618).

[84]  *Quern v. Jordan*, 440 U.S. 332, 347 n 18 (1979); *Cf. Ogbudimkpa*, 342 F.3d at 210 n.7 (courts need not infer decisions on issues from summary decisions) (citing 18B CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 4478 (2d ed. 2002); *see also Univ. Hosps. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 848 n.6 (6th Cir. 2000) (refusing to presume that a "footnote tersely stating [the conclusion] without discussion" constituted law of the case)).

[85]  *Wiest v. Tyco Elecs. Corp.*, 812 F.3d 319, 330 (3d Cir. 2016) (holding that the law of the case doctrine does not apply to a prior ruling on a motion to dismiss and arguments to the contrary are "meritless").

defendant whose motion to dismiss had been previously denied," as "the court must now take into consideration evidence that has been developed through discovery."[86] Undeniably, when the procedural posture has shifted from the dismissal to the summary judgment stage, the Court is no longer required to accept all allegations in the complaint as true and must determine whether the plaintiff has established a *prima facie* case backed by evidence in the record.[87]

The Trustee's argument that the bar to joinder doctrine prevents the Court from considering Kirkland's statute of limitations argument is without merit. The Trustee contends that the Letter Ruling both included an "expansive discussion" of *Laventhol, Krekstein, Horwath & Horwath v. Tuckman*,[88] and then held that "the statute of limitations was not available to K&E here" and that "experts who knowingly conspire with self-dealing fiduciaries are denied the protection of the statute of limitations."[89] This is not an accurate characterization of the Letter Ruling or its holding. In the Letter Ruling, Judge Walsh[90] compares this case to *Laventhol* by quoting at length from the Complaint and then at length from *Laventhol.* But, other than stating that this case "falls squarely within" *Laventhol,* there is no analysis.

In *Laventhol,* the Delaware Supreme Court held that "the principles of law governing the statute of limitations" should apply equally to certified public accountants who were alleged to have conspired with a corporation to defraud shareholders and the corporate

---

[86] *Tse,* 123 F. Supp. 2d at 222 (citing *McIntyre v. Phila. Suburban Corp.*, 90 F. Supp. 2d 596, 603 n.5 (E.D. Pa. 2000)).
[87] *Hazen v. Modern Food Servs., Inc.*, 113 F. App'x 442, 444 (3d Cir. 2004).
[88] 372 A.2d 168 (Del. 1976).
[89] Answering Brief 17.
[90] On December 31, 2014, the Honorable Peter J. Walsh retired, and on January 8, 2015, this adversary proceeding was re-assigned to the undersigned.

directors with whom they conspired.[91]   Thus, the statute of limitations can be tolled in cases

asserting wrongful self-dealing against professionals advising corporations.   But, *Laventhol*

does not stand for the proposition that a defendant is forever denied the benefit of the statute

of limitations.   Rather, even in instances of alleged self-dealing, the statute is tolled only

until the plaintiff knew or had reason to know of the facts alleged to give rise to the wrong.[92]

In finding that this case falls squarely within *Laventhol*, Judge Walsh recognized the

allegations of self-dealing in the Complaint and acknowledged that the self-dealing fiduciary

tolling principle can be applied to Kirkland here.   Crediting the allegations in the

Complaint, as required on a motion to dismiss, Judge Walsh denied the motion because the

Complaint was filed 27 days after the Trustee was on notice of allegations he alleged were

material to his claims.   Far from holding that Kirkland could never be entitled to the benefit

of the statute of limitations, the very language of the holding sounds in inquiry notice,

which reads, in its entirety:

> According to the Complaint, the Trustee on April 17, 2012 first learned from
> a Sun Capital Partners insider that [Kirkland] had a conflicting interest in the
> dividend transaction.   The Trustee's Complaint was filed 27 days later.   I find
> that response time to be quite reasonable.
>
> For the foregoing reasons, I deny the motion to dismiss.[93]

If the Trustee's interpretation of the holding were correct and Kirkland was altogether

denied the benefit of the statute of limitations, there would have been no need to detail

when the Trustee learned of the Alleged Investment Conflict and when he filed the

Complaint.

---

[91] *Laventhol*, 372 A.2d at 170–71 (this was an enlargement, or expansion, of the principle enunciated
in *Bovay v. H.M. Byllesby & Co.*, 22 A.2d 138 (Del. Ch. 1941)).
[92] *Kahn v. Seaboard Corp.*, 625 A.2d 269 (Del. Ch. 1993); *see also* discussion *infra*.
[93] *See* Letter Ruling 7.

As the Court's prior ruling did not hold that Kirkland could never be entitled to the benefit of the statute of limitations, the bar to joinder doctrine does not foreclose a review of the record on a motion for summary judgment to determine whether there is evidence establishing that the statute of limitations should indeed be tolled and/or that Indalex was on inquiry notice of the claims asserted in the Complaint.[94]

Likewise, the Court is not persuaded that summary judgment is precluded here simply because issues of material fact were found to exist in the Sun Adversary on the underlying breach of fiduciary duty claim.  While there is some disagreement in the case law regarding whether the law of the case doctrine applies between adversary proceedings involving different litigants,[95] the Court need not decide that issue.  First, one of the fact issues raised on summary judgment in this case—whether *Kirkland knowingly assisted* Indalex in breaching its fiduciary duty by declaring an unlawful dividend—is not an issue in the Sun Adversary.  Second, even as to the underlying breach, the decision in the Sun Adversary was made on the record in that case, not the record here.  Therefore, no deference will be accorded to the Sun Adversary ruling for purposes of deciding Kirkland's Motion.

## II.    The Trustee's Claims Are Barred by the Statute of Limitations

Given the conclusion reached in the first part of this analysis, the Court may, and should, revaluate Kirkland's renewed statute of limitations argument at this stage.  For

---

[94] Even if the Court is incorrect, at most, the doctrine would bar (within the Court's discretion) any re-examination of whether the statute of limitations is tolled, not whether plaintiff is on inquiry notice.  This would not alter the Court's conclusion as tolling, itself, is assumed for purposes of this decision.  *See* discussion *infra.*

[95] *Compare Webster v. Fujitsu Consulting, Inc. (In re Nettel Corp.),* 2007 WL 2119029, at *1 (Bankr. D.D.C. July 20, 2007) ("The law of the case doctrine does not apply to this proceeding because th[is] proceeding is not the same adversary proceeding . . . and involves different parties.") with *In re Pilgrim's Pride Corp.,* 442 B.R. 522, 530 (Bankr. N.D. Tex. 2010) ("The law of the case doctrine applies in adversary proceedings in a bankruptcy case, and even between separate adversary proceedings in the same bankruptcy case.")

purposes of summary disposition, Kirkland accepts application of Delaware's three-year statute of limitations to both counts.[96] Because ordinary operation of the statute and Bankruptcy Code would render the Complaint untimely, the Trustee argues that certain tolling principles apply to keep his case afloat. For reasons the Court will explain, the Trustee's argument fails and the Complaint, as a consequence, is barred by the statute of limitations.

For statute of limitations purposes, it is well-settled that a cause of action accrues, and the clock generally starts ticking to file a complaint, "at the time of the wrongful act, even if the plaintiff is ignorant of the cause of action."[97] Here, the Trustee's claims accrued—at the latest—on June 1, 2007, the date the Dividend was issued.[98] Accordingly, under ordinary circumstances, the statutory period would have run on June 1, 2010, and the Trustee's Complaint, filed on May 14, 2012, would have been dismissed because the limitations period expired.[99]

Two additional factors, however, come into play under the facts and circumstances of this case. First, due to Indalex's bankruptcy filing, section 108(a) of the Bankruptcy Code

---

[96] Kirkland states:

> Although the parties agree that Delaware's three-year statute of limitations applies to [the Trustee's] aiding and abetting claim, they disagree as to whether Delaware's (three years) or Illinois' statute (two years) applies to [the Trustee's] professional negligence claims. Because [the Trustee's] claims are time-barred under either statute, for purposes of his motion only, [Kirkland] assumes that Delaware's three-year statute applies to both claims.

Memorandum in Support of Summary Judgment 20.

[97] *Pomeranz v. Museum Partners, L.P.*, 2005 WL 217039, at *3 (Del. Ch. Jan. 24, 2005) (quoting *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 319 (Del. 2004)).

[98] *See EBS Litig. LLC v. Barclays Global Inv'rs., N.A.*, 304 F.3d 302, 305 (3d Cir. 2002) (holding that certain claims tied to a dividend transaction accrued upon distribution of the subject dividend).

[99] *See id.* (citing *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *6 (Del. Ch. July 17, 1998)) (stating that plaintiffs' untimely claims would be barred unless they demonstrated a basis for tolling the various limitations periods).

extended the initial June 1 deadline an additional two years from the Petition Date to

March 20, 2011.[100]   Second, six days before the new "108(a) deadline," the Trustee and

Kirkland entered into the Tolling Agreement, which afforded the Trustee another year (plus

the six days remaining on the 108(a) clock).[101]   Therefore, barring other grounds for further

continuation, the clock stopped on March 20, 2012, approximately two months before the

Complaint was filed.

Keenly aware of the timing hurdle, the Trustee argues that the statutory periods

never expired because they were further tolled to the time of the Leder deposition—

regardless of the 108(a) extension and subsequent Tolling Agreement—under the doctrines

of fraudulent concealment and equitable tolling.  Ultimately, the burden is on the plaintiff to

demonstrate that tolling is warranted.[102]   For purposes of this decision only, however, the

Court will credit the Trustee's argument that Kirkland hid the existence of the Alleged

---

[100]   11 U.S.C. § 108(a) provides:
   (a) If applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an
   agreement fixes a period within which the debtor may commence an action, and such
   period has not expired before the date of the filing of the petition, the trustee may
   commence such action only before the later of—
       (1) the end of such period, including any suspension of such period occurring on or
       after the commencement of the case; or
       (2) two years after the order for relief.
[101]   *See* Tolling Agreement ¶ 1 (Dkt. No. 70 Defendant's Ex. 62).  In essence, the Tolling Agreement
tolled, or paused, the statute of limitations clock for one year, using March 14, 2011, as the start
date.  Thus, once March 14, 2012, came around, the Trustee had the six days remaining under the
"108(a) clock" to file the Complaint, assuming no common law tolling doctrine applied.
[102]   *Stevanov v. O'Connor*, 2009 WL 1059640, at *7 (Del. Ch. Apr. 21, 2009) ("To survive a motion for
summary judgment as to a cause of action that accrued outside the statute of limitations, [the
nonmoving party] then would have the burden of showing a reasonable inference that one of the
tolling doctrines recognized in Delaware applies."); *U.S. Cellular Inv. Co. of Allentown v. Bell Atlantic
Mobile Sys., Inc.*, 677 A.2d 497, 503 (Del. 1996) (citing *Kahn v. Seaboard Corp.*, 625 A.2d 269, 277
(Del. Ch. 1993)) ("Summary disposition may be appropriate . . . where the plaintiff has not pled,
and/or the record is devoid of facts indicating, that the statutory limitations period should not
run . . . or is tolled.").

Investment Conflict from Indalex, and that, therefore, Indalex and/or the Trustee may take advantage of one of these two tolling theories.

But while Delaware recognizes both of these tolling mechanisms,[103] "any possible tolling exception to the strict application of the statute of limitations tolls the statute '*only until* the plaintiff discovers (or by exercising reasonable diligence should have discovered) his injury.'"[104] Thus, regardless of the theory, the clock begins to run once the plaintiff is on "inquiry notice" of a possible injury.[105] Such notice "does not require full knowledge of the material facts; rather, plaintiffs are on inquiry notice when they have *sufficient knowledge* to raise their suspicions to the point where persons of ordinary intelligence and prudence would commence an investigation that, if pursued[,] would lead to the discovery of the injury."[106]

### *Whose knowledge matters for purposes of the statute of limitations?*

Presumably driven by the decision on the Motion to Dismiss, the parties' briefs largely focus on whether the Offering Memorandum sufficiently disclosed the Alleged

---

[103] *EBS Litig. LLC*, 304 F.3d at 305 ("Delaware law recognizes three potential sources of tolling: (1) the doctrine of inherently unknowable injuries; (2) the doctrine of fraudulent concealment; and (3) the doctrine of equitable tolling.").

[104] *Pomeranz v. Museum Partners, L.P.*, 2005 WL 217039, at *3 (Del. Ch. Jan. 24, 2005) (quoting *Dean Witter*, 1998 WL 442456, at *6); *see also Bokat v. Getty Oil Co.*, 262 A.2d 246, 251 (Del. 1970) (denying plaintiff the benefit of tolling and distinguishing a prior Delaware Supreme Court case, *Bovay v. H.M. Byllesby & Co.*, 38 A.2d 808 (Del. 1944), on the basis that in *Bovay* the running of the statute had been tolled by the plaintiffs' ignorance of the defendants' actionable self-dealing), *overruled in part on other grounds by Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004); *Kahn*, 625 A.2d at ("The *Bokat* court distinguished the 1944 *Bovay* case on the ground that the complaint in *Bokat* made it clear that plaintiffs *had known all of the acts alleged to give rise to liability* for more than three years before they attempted to add the defendant as a party. Thus, the Supreme Court treated *Bovay* as a case in which the running of the statute had been tolled by ignorance of defendants' actionable self-dealing.").

[105] *Pomeranz*, 2005 WL 217039, at *3 (quoting *Dean Witter*, 1998 WL 442456, at *6).

[106] *Id.* (citing *Dean Witter*, 1998 WL 442456, at *7) (emphasis added); *see also Microsoft Corp. v. Amphus, Inc.*, 2013 WL 5899003, at *17 (Del. Ch. Oct. 31, 2013) (quoting *Pomeranz*, 2005 WL 217039, at *3).

Investment Conflict.  According to the Trustee, the disclosure of the Alleged Investment

Conflict, buried deep within the Offering Memorandum, is equivocal and under no

circumstances can be viewed as alerting the Trustee to Kirkland's future malfeasance.

Rather, revelation of the Alleged Investment Conflict at Mr. Leder's deposition triggered the

investigation into Kirkland and was the first time the Trustee was on notice of the present

claims.  Kirkland responds by arguing that Indalex, not the Trustee, is the relevant actor for

notice purposes and that it certainly knew (or should have known) of any claims it could

assert against Kirkland (as its outside counsel working on the transaction documents),

especially considering Indalex issued the Offering Memorandum.  Alternatively, Kirkland

asserts that even if Indalex is not the appropriate party for inquiry notice purposes, all

bondholders and seventeen stockholders[107] received the Offering Memorandum—which did

provide sufficient information on the Alleged Investment Conflict—and had authority to

bring the instant causes of action.

　　　　As an initial matter, the question of whose knowledge is relevant for purposes of the

statute of limitations—the Trustee's or Indalex's—must be determined.[108]  Actions that may

be pursued by bankruptcy trustees generally fall into two categories: "(1) those brought by

the trustee as successor to the debtor's interest included in the estate under Section 541, and

(2) those brought under one or more of the trustee's avoiding powers"[109]  Under section 541

of the Bankruptcy Code, the bankruptcy estate is comprised of "all legal or equitable

---

[107] Capitalization of Indalex Holdings Finance, Inc. As of Closing of Management Equity Offering
(Dkt. No. 74 Defendant's Ex. 77).
[108] In the Letter Ruling, the Court did not do an analysis of this issue.  To the extent that the Trustee
asserts here that the Letter Ruling is law of the case on whose knowledge matters, the Court
disagrees.
[109] *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 356 (3d Cir. 2001)
(discussing causes of action brought by Committee as representative of the estate).

interests of the debtor in property as of the commencement of the case,"[110] including

"whatever causes of action the debtor may have possessed prior to the petition date."[111]

Any action included in the estate under section 541 that is later pursued by a bankruptcy

trustee is brought by the trustee as successor to the debtor's interest in that claim.  As such, a

section 541 claim is a *debtor* cause of action.  Because the trustee stands in the shoes of the

debtor when bringing these claims, the trustee is "subject to the same defenses as could have

been asserted by the defendant had the action been instituted by the debtor."[112]

Unmistakably then, if the debtor is barred from bringing the section 541 claims by the

relevant statute of limitations, so too is the chapter 7 trustee.[113]  This is true despite the

trustee's innocence in connection with the alleged transgressions.[114]

 As opposed to a debtor cause of action which comes into the estate under section 541

of the Bankruptcy Code, claims that the Bankruptcy Code authorizes the trustee to assert on

behalf of creditors are largely avoidance actions brought pursuant to section 544, 547 and

548 of the Bankruptcy Code.[115]  These powers, exercised by an estate representative, "relate

to the trustee's power to resist pre-bankruptcy transfers of property."[116]  Avoidance actions

---

[110]  11 U.S.C. § 541(a)(1).

[111]  *PAH Litig. Trust v. Water St. Healthcare Partners L.P. (In re Physiotherapy Holdings, Inc.),* 2016 WL 3611831, at *13 (Bankr. D. Del. June 20, 2016) (citing 7 COLLIER ON BANKRUPTCY ¶ 323.03[2] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.)).

[112]  *R.F. Lafferty & Co.,* 267 F.3d at 356 (quoting *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 885 F.2d 1149, 1154 (3d Cir. 1989)).

[113]  *Id.* ("For example, if the debtor has a claim that is barred at the time of the commencement of the case by the statute of limitations, then the trustee would not be able to pursue that claim, because he too would be would barred.  He could take no greater rights than the debtor himself had." (quoting S. REP. NO. 95-989, at 82 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5868)).

[114]  *Id.* ("the appropriate frame of reference for section 541 is the state of the debtor as of the commencement of the bankruptcy").

[115]  *See Hays & Co.,* 885 F.2d at 1155 (claims brought pursuant to the trustee's avoidance powers under the Bankruptcy Code are creditor causes of action).

[116]  *Lafferty,* 267 F.3d at 356.

are not owned by the debtor prepetition, but are within "the unique purview of the trustee."[117] As such, a trustee bringing an avoidance action does not stand in the shoes of the debtor, and thus defenses which may be successful against the prepetition debtor, may not preclude an avoidance action.[118]

It is clear that the claims the Trustee is asserting—professional negligence and aiding and abetting a breach of fiduciary duty—are section 541 claims that Indalex had prepetition against its attorneys. They are not avoidance actions under the Bankruptcy Code. As such, the Trustee is subject to the same defenses that could have been raised against Indalex, had Indalex brought the action itself. In the context of the statute of limitations, therefore, the Court must look to *Indalex's* knowledge, or what it should have known, in connection with the claims the Trustee is asserting.[119]

### Application of the Third Circuit's three-part test for inquiry notice

The Third Circuit has stated that proper resolution of the inquiry notice issue requires careful analysis of (1) the precise nature of the claims asserted by the Trustee, (2) whether and when an objectively reasonable person would have realized the need to investigate the dividend transaction further, and (3) what information that investigation would have disclosed.[120]

---

[117] *PAH Litig. Trust v. Water St. Healthcare Partners L.P. (In re Physiotherapy Holdings, Inc.)*, 2016 WL 3611831, at *14 (Bankr. D. Del. June 20, 2016).

[118] *Id.* (debtor in possession's prepetition release is not binding on trustee and the creditors bringing a post-petition avoidance action, as they were not party to the release).

[119] *Cf. In re AMC Inv'rs, LLC*, 551 B.R. 148 (D. Del. 2016) (the Debtor's knowledge, not that of the creditor granted standing by the bankruptcy court to pursue causes of action on behalf of the estate, was relevant for purposes of the statute of limitations analysis: "Delaware law required the Bankruptcy Court to evaluate when Debtors discovered facts constituting the basis for the breach of fiduciary duty claims, or the existence of facts sufficient to put Debtors on inquiry notice.")

[120] *EBS Litig. LLC v. Barclays Global Inv'rs., N.A.*, 304 F.3d 302, 305 (3d Cir. 2002) (setting forth the analytical framework for determining whether tolling applies under Delaware law).

The precise nature of the claims asserted by the Trustee, as detailed in the

Complaint, are as follows:

40.    In particular, while purporting to give Indalex legal advice with
respect to the dividend transaction, and Indalex's legal obligations related
thereto, and while charging Indalex for its counsel, [Kirkland], among other
things:

- prepared for execution a patently false Board of Directors
  resolution for Indalex UK Limited so that the proceeds from the
  sale of an interest in Asia Aluminum Group ("AAG") could be
  utilized for a dividend paid to, *inter alia*, its client Sun;

- failed to advise Indalex as to the illegality of the June 1, 2007
  dividend under all applicable laws, including the laws of the United
  Kingdom;

- prepared for execution Board of Directors' Unanimous Consents
  for Indalex Holdings Finance, Inc. and Indalex Holding Corp.
  which it knew or should have known were patently false so that the
  dividend could be paid to, *inter alia*, its client Sun and so that each
  Board member could benefit financially;

- prepared for execution Board of Directors' Unanimous Consents
  for Indalex Holdings Finance, Inc. and Indalex Holding Corp.
  which it knew or should have known were patently false so as to
  permit [Kirkland] partners to benefit financially;

- prepared for execution Board of Directors' Unanimous Consents
  for Indalex Holdings Finance, Inc. and Indalex Holding Corp.
  which it knew or should have known were patently false in an
  effort to protect the controlling insiders, including Sun, from
  liability under Delaware corporate law;

- failed to ensure that FTI Capital Advisors ("FTI") had any
  professional competence, experience, reputation or prominence in
  the area of business solvency;

- insisted on the inclusion of language in a letter issued by FTI in an
  effort to protect the controlling insiders, including Sun, from
  liability under Delaware's fraudulent transfer statute;

- insisted on the inclusion of language in a letter issued by FTI which
  protected Sun, but not Indalex, in any potential cause of action
  involving FTI;

- failed to advise Indalex that a [Kirkland] partner was on the Board of Directors of FTI and that the [Kirkland] partner had a financial interest in FTI; and

- advised Indalex that one or more entities paying the dividend did not have to be covered by the letter issued by FTI.[121]

While the Trustee ascribes motivations to Kirkland for their actions, the salient allegations are that Kirkland, in numerous, various and different ways: failed to provide proper legal advice with respect to the Dividend, drafted resolutions and other documents that they knew or should have known were patently false with respect to the Dividend, and had a major role in obtaining and/or negotiating the FTI Report to bless the Dividend.  The Trustee alleges that the Dividend was made while Indalex was insolvent and/or made Indalex insolvent, and that Kirkland's advice both aided and abetted Sun Capital and Indalex's board of directors in breaching their fiduciary duties, and constituted legal malpractice.  The Trustee's claims therefore hinge on the solvency/insolvency of Indalex either before the issuing of the Dividend, or shortly thereafter.

Having identified the nature of the claims asserted by the Trustee, the Court next determines whether and when Indalex had sufficient knowledge to raise its suspicions (i.e., was objectively aware of facts giving rise to the alleged wrong) or, in other words, when an objectively reasonable person should have realized the need to investigate the dividend transaction further.  Unfortunately, in their briefing, Kirkland and the Trustee focus on the Alleged Investment Conflict.  But that has little, if any, bearing on whether Indalex can be charged with inquiry notice of the claims asserted by the Trustee as identified above.

---

[121]  Complaint ¶ 40.

Knowledge of the defendant's motivation to inflict the injury or the defendant's concealment of his motivation to inflict the injury, is not relevant to a notice inquiry analysis. "Inquiry notice does not require actual discovery of the reason for the injury. Nor does it require plaintiffs' awareness of all of the aspects of the alleged wrongful conduct."[122] So, while knowledge of the Alleged Investment Conflict may have prompted Indalex to include Kirkland in its investigation of Indalex's injuries stemming from the Dividend, the inverse is not true. Lack of knowledge of the Alleged Investment Conflict—in and of itself—cannot suffice to defeat a statute of limitations defense where Indalex had knowledge of its injuries arising from the Dividend. Because the undisputed facts demonstrate that Indalex possessed sufficient information shortly after the time of the Dividend, which, if pursued, would have led it to discover the alleged injury—that the Dividend was made while Indalex was insolvent, or rendered it insolvent—the Trustee cannot seek refuge under his tolling theories.

As Kirkland notes, in passing,[123] and as supported by the undisputed facts in the record, Indalex knew that: Kirkland represented both Sun and Indalex,[124] Kirkland provided legal advice with respect to the Dividend,[125] Kirkland prepared the Consents[126] and Indalex paid the Dividend to its shareholders.[127] The Trustee also asserts that Kirkland (and, thus

---

[122] *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *7 (Del. Ch. July 17, 1998).
[123] Memorandum in Support of Summary Judgment 25.
[124] Kirkland Engagement Letter (Dkt. No. 70 Defendant's Ex. 31).
[125] May 18, 2007 email from Ted Frankel to Mike Alger (Dkt. No. 73 Plaintiff's Ex. 32); July 11, 2006 email from Jeremy Liss to Mike Alger (Dkt. No. 73 Plaintiff's Ex. 33).
[126] May 31, 2007 email from Ted Frankel of Kirkland to, among others, Mike Alger and Sun Capital employees (Dkt. No. 73 Plaintiff's Ex. 31).
[127] *See* 6/29/07 Analyzed Checking Statement for Indalex Inc. (Dkt. No. 73 Plaintiff's Ex. 29).

Debtors) knew that Indalex Inc. was balance sheet insolvent when the Dividend was issued.[128]

Moreover, shortly before the Dividend was issued, Indalex disclosed in its April 10-Q that Indalex Inc. held assets worth approximately $47.7 million more than its total liabilities. According to the Trustee's Complaint, the Dividend caused all of the Indalex entities, including "Indalex Inc. to be insolvent, insufficiently capitalized and/or unable to meet [its] debts when due."[129] Seemingly fitting this theory, Indalex revealed in its July 10-Q—for the period ending July 1, 2007 (one month after the Dividend)—that Indalex Inc. was now balance sheet insolvent by more than $33.7 million. The July 10-Q also disclosed the fact that the $76.6 million dividend was issued on June 1, 2007—which was in the period between the two quarterly reports.[130] The harm or injury on which the Trustee predicates his claims was therefore known to Indalex, at the latest, by August 10, 2007, the date that the July 10-Q was filed with the SEC[131]. Assuming the Dividend actually rendered all of the Indalex entities insolvent, as alleged in the Complaint, the company at a minimum should have recognized the need to investigate the Dividend given the close temporal proximity between the distribution and the company's own declaration that Indalex Inc.

---

[128] Answering Brief 14 (citing Dkt. No. 73 Plaintiff's Ex. 34).

[129] Complaint ¶ 4; see also id. ¶ 48 (various Sun Capital-related persons breached their fiduciary duties to Indalex by "declaring a dividend which benefitted them and rendered Indalex insolvent and/or was made at a time when Indalex was already insolvent.").

[130] The July 10-Q, while not containing the April 10-Q figures, reflects that Indalex was balance sheet solvent on of December 31, 2006, only six months prior to the Dividend.

[131] Indeed, Plaintiff's proffered expert on professional negligence relies on the existence of the July 10-Q, stating that "[a]nd last is the fact that the payment of this dividend resulted in the balance sheet of Indalex, Inc., the entity paying the dividend, reflecting that its balance sheet liabilities exceeded its balance sheet assets."). Supplemental Report of Lawrence J. Fox 3 (Dkt. No. 73 Plaintiff's Ex. 49) at B453.

was balance sheet insolvent.[132] Any such investigation would have quickly led the company to the Dividend as a possible cause of its injury and even to the realization that Kirkland—as the lawyers handling the transaction for both Indalex and Sun—may have contributed to that injury.[133]

Ordinary operation of the three-year statute, therefore, would require the claims in the Complaint to have been brought, at the latest, by August 10, 2010—three years after the July 10-Q was filed. However, due to the 108(a) extension and Tolling Agreement, that deadline was extended to March 20, 2012. The Complaint, filed on May 14, 2012, was therefore barred by the statute of limitations.

The same holds true even if, under Delaware law, the Court should analyze inquiry notice from the perspective of Indalex's creditors and stockholders.[134] For instance, the Delaware Court of Chancery has typically looked to stockholders' constructive knowledge in the context of derivative actions where tolling is likewise asserted.[135] Those cases,

---

[132] *See Am. Int'l Grp. v. Greenberg*, 965 A.2d 763, 813 (Del. Ch. 2009) ("If AIG's public filings had given the Stockholder Plaintiffs good reason to be suspicious about the existence of a claim more than three years before the filing of that claims—i.e., if the public filings provided them with inquiry notice—tolling would have then stopped and the Stockholder Plaintiffs would now be barred."), *aff'd sub nom. Teachers' Ret. Sys. of La. v. PriceWaterHouseCoopers LLP*, 11 A.3d 228 (Del. 2011) (en banc).

[133] To be clear, the Court is not making any factual findings or legal conclusions regarding whether Indalex was or was not insolvent, or, if so, the cause of the insolvency.

[134] The Trustee argued that only the Trustee's knowledge was relevant, but Kirkland argued that "[b]ecause the undisputed facts show that Indalex itself disclosed the Kirkland partners' investments . . . Indalex[] bondholders and shareholders were on inquiry notice" of the Trustee's claims. *Reply in Support of Kirkland & Ellis LLP's Motion for Summary Judgment* 3 ("Reply in Support of Summary Judgment") (Dkt. No. 74). While the Court's focus is not on the Alleged Investment Conflict, Kirkland is correct that under certain circumstances what stockholders or creditors should have known is the operative question.

[135] *See, e.g., Am. Int'l Grp.*, 965 A.2d at 812–14 (examining whether plaintiff stockholder, not the corporation, had inquiry notice of the purported derivative claims).

however, appear to focus on stockholders because they are the plaintiffs in the applicable actions.[136]

Here, any non-insider stockholders—and, as importantly, bondholders holding in excess of $190 million in 11.5% Notes due 2014[137]—were on inquiry notice of the claims the Trustee is asserting for at least one of the same reasons as Indalex. Both the balance sheet insolvency and Dividend were disclosed in one document: the July 10-Q. Thus, assuming the accuracy of the Trustee's Complaint, Indalex stakeholders were on notice of the injury and should have looked into whether a dividend of the size issued could have rendered the company insolvent,[138] especially considering the fact that Indalex Inc. was balance sheet solvent as of December 31, 2006 (as disclosed in the July 10-Q) and as of April 1, 2007 (as disclosed in the April 10-Q). Therefore, even if this was a derivative action brought by stockholders or creditors of an allegedly insolvent Indalex, the Complaint would similarly be barred by the statute of limitations.

---

[136] *Microsoft Corp. v. Amphus, Inc.*, 2013 WL 5899003, at *18 (Del. Ch. Oct. 31, 2013) (struggling with the same question before this Court, namely "whose knowledge matters?" and deciding for purposes of that case that it will focus on the plaintiff's knowledge and not that of the nominal defendant corporation; also noting that the "Court's prior decisions addressing laches in the derivative context appear to focus on the plaintiff's knowledge"). The analysis performed herein is consistent with the Chancery Court's approach as it focuses on Indalex's knowledge because the Trustee, as plaintiff, is asserting a section 541 action.

[137] *See generally N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92 (Del. 2007) (under Delaware law, creditors of an insolvent corporation have standing to pursue derivative actions on behalf of a corporation for breach of fiduciary duties).

[138] *See In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *8 (Del. Ch. July 17, 1998) (rejecting a tolling argument where all the information necessary to put the plaintiff on notice of his claim was found in one annual report).

*Does the statute of limitations analysis change because Sun Capital controlled Indalex's board of directors?*

During oral argument on the Motion, the Trustee's counsel appeared to invoke the doctrine of adverse domination.[139] This doctrine tolls the statute of limitations on a corporation's claims against its officers and/or directors while the corporation's board is controlled by blameworthy directors.[140] "The premise underlying the adverse domination doctrine is that a corporation acts through its board of directors, and when that board of directors is controlled by culpable directors it will not cause the corporation to bring a lawsuit against themselves."[141] As Judge McKelvie explained in *Marvel*, sister states that recognize the doctrine adopt variations on the theme, but Delaware has not recognized this doctrine at all.[142] In the fourteen years since that decision, this still holds true.[143]

What is more, Judge McKelvie ruled that the concern addressed by the adverse domination doctrine is not implicated in instances, such as *Marvel*, where the director defendants dominated the board, but the alleged harmful act was disclosed in public documents to shareholders. Specifically, Judge McKelvie held that in such situations, "the corporate entity is no longer without redress against those who control it because the shareholders have both the knowledge and authority to protect the corporation's rights, and therefore, there is no reason to toll the statute of limitations."[144] He finds this position

---

[139] The Trustee's counsel argued that: (i) the only people with knowledge were insiders who had no interest in pursuing a claim (Transcript 54); and (ii) that in order to put Indalex on inquiry notice, there would have to be "someone in management in a position to do something about it, or anyone on the Board, knew. But I say since they were self-dealing fiduciaries, everyone one of them had an interest." (Transcript 66). The doctrine is also mentioned footnote 10 of the Answering Brief. Answering Brief 16 n.10.

[140] *In re Marvel Entm't Grp., Inc.*, 273 B.R. 58, 74 (D. Del. 2002).

[141] *Id.*

[142] *See id.*

[143] *See In re AMC Inv'rs, LLC*, 551 B.R. 148, 154 (D. Del. 2016).

[144] *Marvel*, 273 B.R. at 76.

supported by the genesis of derivative actions, which "enable shareholders to sue in the corporation's name where those in control of the company refused to assert a claim belonging to it"[145] as well as Delaware's recognition of the tolling doctrine discussed *supra*. Citing, among other cases, *Dean Witter* and *United States Cellular*, he noted that Delaware courts have "consistently rejected" equitable tolling when the facts underlying the claim were disclosed in publically filed documents.[146]  While these cases do not address the adverse domination doctrine, they address the underlying assumption of that doctrine: "with control comes non-disclosure and without knowledge of directors' wrongful activities plaintiffs have no meaningful opportunity to bring suit."[147]

The corporate relationships in *Marvel* are similar to those in the matter *sub judice*. Simplified as pertinent to this discussion, in *Marvel*, the debtor (Marvel Entertainment Group, Inc.) sued Mafco Holdings, Inc, which formerly held, directly or indirectly, 80% of the debtor's equity and had the ability to elect all of the members of the debtor's board.  In turn, defendant Ronald O. Perelman was a former member of the board, and held 100% of Mafco's outstanding stock; he, therefore, ultimately elected the debtor's board members. Marvel Entertainment alleged that while it was part of Mafco's consolidated tax filing group, Mafco used the debtor's net operating losses for the benefit of Mafco and without compensation under a certain tax sharing agreement.  The complaint sounded in three counts all related to the net operating losses: (i) breach of fiduciary duty; (ii) breach of the tax sharing agreement and (iii) an avoidance action.  The tax sharing agreement was disclosed in Marvel Entertainment's 1993 Form 10-K, the year the contract was formed.

---

[145] *Id.* (citing *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984)).
[146] *Id.*
[147] *Id.* at 77 (citing *Hecht v. Resolution Tr. Corp.*, 635 A.2d 394, 401 (1994)).

The complaint was filed more than five years later. Based on his analysis and the public disclosure of the tax sharing agreement, Judge McKelvie held that Marvel Entertainment's claim for breach of fiduciary duty against Perelman was barred by the statute of limitations. Specifically, he held:

> Because the court believes that Delaware's tolling mechanisms, in combination with the availability of shareholder derivative actions, already address the concerns that underlie the adverse domination doctrine, the court declines to recognize the doctrine as a viable tolling mechanism in Delaware. Moreover, even if the court were to accept that the adverse domination doctrine could be applied in Delaware, the court would decline to do so upon these facts, because the fiduciaries disclosed the tax sharing agreement at issue here in its 1993 Form 10-K.[148]

The holding of and reasoning in *Marvel* are compelling regarding the adverse domination doctrine, and are also illuminating on tolling, in general. As applied to the matter *sub judice*, the same result is attained: the Trustee's claims are barred by the statute of limitations. The Court is persuaded that Delaware has not adopted the adverse domination doctrine and so rejects that argument to the extent it was suggested by the Trustee. But, to the extent that the Court were to accept the doctrine, it would not toll the statute of limitations until the domineering directors were no longer on the board; rather, the statute would be tolled only until public disclosure of the acts underlying the Trustee's claims. As in *Marvel*, the public disclosure of the acts underlying the adverse domination doctrine eliminates concerns here. To paraphrase: as of August 10, 2007, Indalex was "no longer without redress against those who control it" because the bondholders had "both the

---

[148] *Id.*

knowledge and authority to protect the corporation's rights, and therefore, there is no reason to toll the statute of limitations."[149]

### Does equity compel a different result?

Finally, the Court cannot help but note that the tolling doctrines are equitable in nature, and the equities do not favor the Trustee here. The Trustee was appointed on October 30, 2009. He had almost two and one-half years before the March 12, 2012 deadline to investigate and file suit against Kirkland, if appropriate. The extended deadline was also nineteen months after he filed the Sun Adversary. By that point, at the latest, the Trustee clearly was aware of Kirkland's involvement in the transaction. Nonetheless, despite the additional time granted under the Bankruptcy Code and by Kirkland, voluntarily, through the Tolling Agreement, the Trustee still failed to bring his claims on time. As far as the Court can tell, no investigation into Kirkland's role in the Dividend transaction was performed during the entirety of that period. The only explanation provided was that the Trustee relied on Mr. Gessner's declaration (made on December 8, 2010), which the Trustee contends characterizes Kirkland as a mere scrivener in connection with the Dividend transaction and does not disclose the Alleged Investment Conflict.[150]

---

[149] *Id.* at 76; The Court notes that both parties cite *Lease Resolution Corp. v. Larney*, 719 N.E.2d 165 (Ill. App. Ct. 1999) for Illinois law on the doctrine of adverse domination. Answering Brief 16 n.10; Reply Brief 12 n.13. The Trustee is correct that Illinois recognizes a variation of the adverse domination doctrine. But, the doctrine creates only a rebuttable presumption that knowledge will be unavailable to others as long as the wrongdoers control the corporation. Kirkland is correct that the presumption may be rebutted by evidence that persons other than the culpable directors had knowledge of the cause of action and the ability and motivation to bring the cause of action. *Id.* at 173; *Flynn v. Gecker (In re Emerald Casino, Inc.)*, 2009 WL 3678925 (N.D. Ill. Nov. 3, 2009) ("Such evidence, if proven, would make the doctrine inapplicable.") (*citing Larney*, 719 N.E.2d at 173). Applying Illinois law, therefore, would not change the result.

[150] Declaration of Douglas C. Gessner, P.C., (Dkt. No. 70 Defendant's Ex. 7). This declaration was submitted in the Sun Adversary and was made in support of the *Sun Capital Defendants' Opposition to Motion to Disqualify Kirkland & Ellis LLP.*

And, the Trustee requested documents from Kirkland, but was rebuffed.

As to the Gessner Declaration, it reflects that the Trustee reviewed, in detail, the time records submitted by Kirkland to Indalex, including entries reflecting work on the Dividend, the April 2007 10-Q, the FTI Report and the Consents.  While it is true that Mr. Gessner attempts to minimize the work performed by Kirkland for Indalex, he specifically identifies work which forms the basis of the Complaint.

For example, Mr. Gessner states:

- Kirkland's work [on the Consents] revolved solely around whether Indalex's resolutions met the technical requirements required under relevant Delaware law and Indalex's various indenture and credit agreements.

- All of the comments provided by Mr. Liss, Mr. Smith, and me with respect to the FTI solvency opinion related to the technical requirements of the Delaware statute and addressed whether the opinions set forth in FTI's opinion adequately addressed those requirements.  Neither Mr. Liss, Mr. Smith, nor I provided any analysis or advice with respect to FTI's analysis or conclusions regarding the Debtors' financial condition.

- With respect to the AAG sale and the resulting dividend, Kirkland did not provide any analysis with respect to Indalex's financial condition. Instead, Kirkland's advice related to Indalex's legal obligations relating to the AAG transaction.  For example, Mr. Frankel, who billed 6.5 hours related to this subject, was one of the primary attorneys representing Sun Capital in the 2006 acquisition of Indalex. Accordingly, Mr. Frankel's advice to Indalex was limited to providing institutional knowledge regarding Indalex's obligations under the various acquisition agreements and providing the basic requirements for dividends under Delaware law . . . .[151]

Rather than supporting the Trustee's position, at the very least, the Gessner Declaration suggests a deposition of Mr. Gessner was appropriate to confirm—if not test—his testimony.[152]

---

[151] *Id.* ¶¶ 18, 17, 13

[152] Further, multiple emails relied on by the Trustee in the Answering Brief show that Kirkland was providing advice with respect to the very acts that form the basis of the Trustee's claims.  *See*

As for the documents that were not forthcoming, the Trustee did not seek the Court's

assistance by way of Rule 2004 examination or otherwise.  Under these circumstances,

equity does not demand a different result.

**III.    The Professional Negligence Claim:  Alternatively, Summary Judgment is
Appropriate on Count II of the Complaint Because the Trustee has Failed to
Submit Appropriate Expert Testimony on Delaware's Standard of Care**

In Count II of the Complaint, the Trustee alleges that Kirkland was negligent with

respect to the advice it provided to Indalex regarding the Dividend.[153]  Specifically, the

Trustee alleges that "[i]n performing legal services for Indalex, [Kirkland] performed their

services negligently and below the standard of reasonable care, skill and diligence expected

of lawyers advising Delaware corporations on their obligations under applicable law

including, but not limited to, Delaware law."[154]

Under Delaware law,[155] in order to recover for legal malpractice, the plaintiff must

prove the employment of the defendant as its attorney, the attorney's neglect of a reasonable

---

Kirkland's Statement of Legal Services Rendered February 2, 2006 (reflecting 5,109 hours of work in connection with the Acquisition and that, even then, Kirkland was billing time related to AAG and a solvency analysis) (Dkt. No. 73 Plaintiff's Ex. 5); May 14, 2007 email from Jeremy Liss of Kirkland to Mike Alger of Indalex (regarding AAG, the distributable reserves and board resolutions) (Dkt. No. 73 Plaintiff's Ex. 30); May 31, 2007 email from Ted Frankel of Kirkland to, among others, Mike Alger and Sun Capital employees (regarding the Dividend with attached consents and a spreadsheet showing the allocation among stockholders) (Dkt. No. 73 Plaintiff's Ex. 31; May 18, 2007 email from Ted Frankel to Mike Alger (stating that no solvency opinion is needed for Indalex UK) (Dkt. No. 73 Plaintiff's Ex. 32); July 11, 2006 email from Jeremy Liss to Mike Alger (regarding Dividend) (Dkt. No. 73 Plaintiff's Ex. 33); May 30, 2007 email from Brandon Smith of Kirkland to, among others, Mike Alger (regarding Kirkland's comments to the FTI Report and attached redline) (Dkt. No. 73 Plaintiff's Ex. 48).

[153] *See* Complaint ¶¶ 54–62.

[154] *Id.* ¶ 57.

[155] The Court is applying Delaware law with respect to Count II of the Complaint.  In the Memorandum in Support of Summary Judgment, Kirkland briefed Delaware case law, which went unrebutted in the Trustee's Answering Brief.  Further, to the extent that the Trustee referred to applicable law at all on Count II, he referred to The Delaware Rules of Professional Conduct or the model rules.  *See* Answering Brief 32, 38 n.19, 39.

duty, and that such negligence caused the plaintiff to incur damages.[156]  Ordinarily, expert

testimony is necessary to substantiate such a claim.[157]  Specifically, an expert must testify as

to the standard of care governing the lawyer's allegedly negligent conduct.[158]  An exception

exists "when the professional's mistake is so apparent that a layman, exercising his common

sense, is perfectly competent to determine whether there was negligence."[159]  In other words,

the conduct, or lack thereof, is so obvious that expert testimony is not required to assist

the factfinder.[160]

Neither party contends that the matters involved are so simple, or the lack of skill

and diligence so obvious, as to be within the range of the ordinary experience of laymen,

thus excusing the requirement of expert testimony.  The Court agrees with that assessment.

Whether Kirkland was negligent in its representation of Indalex is a question that cannot be

answered by the knowledge and experience of the average person.  Accordingly, the Court

finds that expert testimony is required in this case to establish the applicable standard of care

and any deviation therefrom.

The Trustee's theory of malpractice is based upon a complex web of professional

conflicts—among various other violations of the ethical rules—that purportedly motivated

---

[156] *Middlebrook v. Ayres*, 2004 WL 1284207, at *5 (Del. Super. Ct. June 9, 2004) (quoting *Weaver v. Lukoff*, 1986 WL 17121, at *1 (Del. July 1, 1986)), *aff'd*, 867 A.2d 902 (Del. 2005).

[157] *See Flowers v. Ramunno*, 2011 WL 3592966, at *2 (Del. Aug. 16, 2011) ("[I]t is well-settled that expert testimony is necessary to support a claim of legal malpractice, except in those cases where the attorney's mistakes are so obvious that such testimony is not required."); *see also Brooke v. Elihu-Evans*, 1996 WL 659491, at *1 (Del. Aug. 23, 1996) ("Ordinarily, in a legal malpractice action the plaintiffs have the burden of establishing by expert testimony the specific duty of care imposed on the attorney and its breach.  Where the negligence is so obvious as to be within common knowledge and experience (the common knowledge exception) no expert is needed.").

[158] *Elihu-Evans*, 1996 WL 659491, at *1.

[159] *Weaver*, 1986 WL 17121, at *1 (citing *Larrimore v. Homeopathic Hosp. Assoc. of Del.*, 181 A.2d 573, 577 (Del. 1962)).

[160] *Lorenzetti v. Enterline*, 2012 WL 1383186, at *2 (Del. Apr. 18. 2012) (describing exception to expert testimony requirement as "well-settled" under Delaware law).

Kirkland to give self-interested legal advice to Indalex for the benefit of Sun Capital and certain Kirkland attorneys. The Trustee relies upon the opinion of his proffered expert, Lawrence J. Fox, to establish professional negligence. As evidenced by the *curriculum vitae* attached to his initial report,[161] Mr. Fox is a highly qualified expert in the area of legal ethics who is well-versed in the field of professional responsibility.[162] Mr. Fox opines that Kirkland attorneys representing Indalex violated myriad rules of professional responsibility including, among other, Rules 1.7 and 1.8 of The Delaware Lawyers' Rules of Professional Conduct (the "Rules"), and thus committed professional negligence. He also faults Kirkland for not following its prior advice or practice regarding a previous dividend declared by Indalex.[163] As for Kirkland's experts, the Trustee argues that the credibility and persuasiveness of Kirkland's experts will be an issue as none of them has been qualified to testify on the standard of care for a lawyer in a malpractice action. Thus, the Trustee characterizes this matter as "present[ing] the classic case of dueling experts who disagree on whether [Kirkland's] behavior towards Indalex comported with the applicable standards of care."[164]

Kirkland's position on Count II is straightforward. Kirkland contends that, while not required on a motion for summary judgment, they provided expert testimony on the

---

[161] 11/13/14 Expert Report of Lawrence J. Fox ("Fox Report") (Dkt. No. 70 Defendant's Ex. 65) at A3025–50.

[162] Mr. Fox readily admits that he is not an expert on corporate transactions, private equity dealings, business valuations and solvency issues, and he does not opine on such issues. Select Pages of Transcript of Deposition of Lawrence J. Fox (Dkt. No. 70 Defendant's Ex. 64) at A2990-91.

[163] 2/11/2015 Supplemental Report of Lawrence J. Fox 15 (Dkt. No. 73 Plaintiff's Ex. 49) ("[T]he standard of care for declaring a dividend in this case was [also] established by [Kirkland] itself" when it previously advised the Indalex board on the earlier dividend. "Kirkland[] fail[ed] to conform to its own advice . . . ."); *see also* Answering Brief 34 ("Plaintiff's expert, Mr. Fox, evaluated [Kirkland]'s conduct not only by the applicable Rules of Professional Conduct, but by [Kirkland]'s own advice.").

[164] Answering Brief 31.

appropriate standard of care through the expert reports of Richard M. Leisner, William H.

Coquillette and Jonathan Macey.[165]  Kirkland further contends that the Trustee's expert,

Mr. Fox, has not opined as to the appropriate standard because neither a breach of the rules

governing professional conduct nor an alleged failure to adhere to a firm's own prior advice

establishes a suitable metric for evaluating professional negligence.  Kirkland concludes that

because the Trustee has not countered their expert testimony with evidence on the standard

of care, the Trustee has failed to raise a disputed issue of material fact with respect to the

standard, thus summary judgment must be granted in its favor.

Having already determined that expert testimony is necessary for the Trustee to

prove his claim of professional negligence, the Trustee must show that his expert has opined

as to the relevant standard of care.[166]  In a legal malpractice action, the standard of care is

"the skill and knowledge ordinarily possessed by attorneys under similar circumstances."[167]

In his briefing, it is unclear whether the Trustee contends that the Rules establish an

---

[165]  Kirkland does not rely on the expert report of P. Clarkson Collins, Jr. for the standard of care.
Mr. Collins opined both that Kirkland's representation of Indalex with respect to the Dividend as
well as Kirkland's concurrent representation of Sun Capital and Indalex satisfied the standards of the
Rules. 1/12/15 Expert Report of P. Clarkson Collins, Jr., Esquire (Dkt. No. 70 Defendant's
Ex. 63).
[166] *Gans v. Mundy*, 762 F.2d 338, 343 (3d Cir. 1985) (because standard of care is an element of a
malpractice action, Federal Rule of Civil Procedure 56 requires the nonmoving plaintiff to establish
the standard on a motion for summary judgment once movant/defendant avers facts and to allege
that its conduct was not negligent, even if defendant did not provide an expert report).  Here,
Kirkland has proffered three expert reports in support of the position that the firm's conduct was not
negligent.  Accordingly, the burden has shifted to the Trustee.
[167] *Beneville v. Pileggi*, 2005 WL 1026947, at *7 (D. Del. Apr. 22, 2005) (citing 3 RONALD E.
MALLEN ET AL., LEGAL MALPRACTICE § 19.2 (5th ed. 2000); DAN B. DOBBS ET AL., THE LAW OF
TORTS § 720 (2d ed. 2016) ("attorneys owe clients the skill, care, knowledge and diligence exercised
by reasonable and prudent lawyers in similar circumstances"); Michael P. Ambrosio & Dennis F.
McLaughlin, *The Use of Expert Witnesses in Establishing Liability in Legal Malpractice Cases*, 61 Temp. L.
Rev. 1351 (Winter, 1988) ("the required standard of conduct is the exercise of professional care
and skill").

independent cause of action, establish the standard of care applicable under the circumstances, or both.  Given this ambiguity, the Court will address each theory in turn.

The first theory is easily dismissed.  Under Delaware law, there is no private right of action solely for a violation of the Rules.[168]  Delaware courts are clear that the Rules, by themselves, do not comprise a basis for civil liability.[169]  For instance, in the recent case of *Dickerson v. Murray*,[170] the plaintiff brought suit against her former attorney alleging negligent provision of legal services due, in part, to a purported conflict of interest.[171]  Addressing that claim, the Superior Court held that "violations of [the Rules], standing alone, are not actionable because the Rules themselves were not intended to be independent causes of action."[172]  To hold otherwise would be contrary to the Rules' stated purpose.[173]

The second theory must also be dismissed as the Rules do not provide the applicable standard of care.  In *Flaig v. Ferrara*,[174] the Delaware Superior Court specifically rejected application of the Rules as the *standard of care* in legal malpractice cases.[175]  Similar to the Trustee's contentions here, the plaintiff in *Flaig* argued that the attorney/defendant had an undisclosed conflict of interest that tainted his representation of her.  She further argued that

---

[168] *In re Appeal of Infotechnology, Inc.*, 582 A.2d 215, 220 (Del. 1990) ("Thus, it is clear that even though lawyers have substantive legal duties, which may be congruent with the requirements and objectives of the [Delaware Lawyers' Rules of Professional Conduct], the latter provide no additional bases for the enforcement of such duties outside of the framework of disciplinary proceedings."); *see also Brooks-McCollum v. Shareef*, 2006 WL 3587246 (Del. Super. Ct. Nov. 1, 2006) (holding that plaintiff did not have standing to recover damages based solely on a violation of the professional rules).

[169] *See, e.g.*, *Flaig v. Ferrara*, 1996 WL 944860, at *3 (Del. Super. Ct. Apr. 15, 1996) ("Violation of the rules does not establish civil liability or constitute negligence per se.").

[170] 2015 WL 447607 (Del. Super. Ct. Feb. 3, 2015).

[171] *Id.* at *1.

[172] *Id.* at *4.

[173] *Id.* ("[A]n alleged Rule violation by the Plaintiff, in itself, does not provide the basis for civil liability as this is contrary to the Rules' stated purpose.").

[174] 1996 WL 944860 (Del. Super. Ct. Apr. 15, 1996).

[175] *Id.* at *2–3 (finding that the Rules do not establish substantive legal duties for attorneys nor do they create civil liability for their breach).

Rule 1.7 established a standard for assessing her prior attorney's alleged negligence.[176]  In granting partial summary judgment in favor of the attorney/defendant, the Superior Court emphasized that the Scope section of the Preamble "makes clear that the Rules are not to form a basis for civil liability."[177]

In *Flaig*, Judge Quillen relied on the clear directive of the Delaware Supreme Court in *In re Appeal of Infotechnology*, which stated that, while "lawyers have substantive legal duties, which may be congruent with the requirements and objectives of the Rules, the latter provide no additional bases for the enforcement of such duties outside of the framework of disciplinary proceedings."[178]  Applying the Delaware Supreme Court's mandate, Judge Quillen held that the Rules may not comprise the standard of care against which a lawyer's actions will be judged in a legal malpractice suit.[179]  Specifically, he held that "the use of the Rules as a legal standard to show an independent breach of a duty would be directly contrary to Delaware Supreme Court precedent and the Scope of the Rules."[180]

Finding *Flaig* persuasive, this Court holds that the Rules cannot be used to establish the standard of care applicable to the Trustee's professional negligence claim.  Any other

---

[176] *Id.*

[177] *Id.* at *2 (quoting DEL. LAWYERS' R. OF PROF'L CONDUCT pmbl. ¶ 20 ("Violation of a Rule should not itself give rise to a cause of action against a lawyer nor should it create any presumption in such a case that a legal duty has been breached. . . . [The Rules] are not designed to be a basis for civil liability.")).

[178] The *Infotechnology* court also emphasized that as a "fundamental constitutional principle [it], alone, has the sole and exclusive responsibility over all matters affecting governance of the Bar." 582 A.2d 215, 220 (Del. 1990) (assessing the Rules in the context of whether an adversary has standing to challenge an alleged conflict of interest).

[179] *Flaig*, 1996 WL 944860, at *3.

[180] *Id.*

determination would be logically inconsistent with Delaware's prohibition on using the Rules to bring independent causes of action.[181]

That being said, it is true that under Delaware law the breach of an ethical rule, if relevant, may be considered *evidence* of professional negligence in certain circumstances.[182] Evidence, however, is distinct from the standard of care, which must exist independently of the Rules.[183] Thus, an expert may refer to the Rules to support a claim of negligence, but only to the extent the Rules are "expressive of the common law duty otherwise owed" to the client.[184] Put differently, the Rules may *bolster*, but do not establish, a breach of the standard of care.

Here, the Trustee bases his claim on professional negligence, i.e. that Kirkland's services were "below the standard of reasonable care, skill and diligence expected of lawyers advising Delaware corporations on their obligations under applicable law."[185] The Trustee also contends that in its representation of Indalex, Kirkland "failed to satisfy its duty to act in the highest degree of fidelity, loyalty and good faith towards Indalex" and failed to explain the existence of a conflict between [Kirkland], Indalex and Sun so as to permit

---

[181] *See Potter v. Peirce*, 688 A.2d 894, 897 (Del. 1997) (describing the inability to bring a private cause of action based on a violation of the professional rules as already having been confirmed by the Delaware Supreme Court).

[182] *See In re Wilmington Sav. Fund Soc'y v. Dotey*, 1994 WL 146370, at *2 (Del. Super. Ct. Feb. 28, 1994) (holding that an expert witness may refer to the professional rules to bolster a legal malpractice claim to the extent that the rules are congruent with some independent, substantive duty imposed on lawyers by the common law)..

[183] *See Flaig*, 1996 WL 944860, at *3 (quoting *Dotey*, 1994 WL 146370, at *2).

[184] *Id.; Gatz Properties LLC v. Preston*, 2014 WL 1725822 (Del. Super. Ct. Apr. 15, 2014) (in motion to dismiss context, permitting plaintiff to replead and introduce Rules as evidence of negligence where plaintiffs allege that if they had been timely notified of the conflict, they would have hired new counsel and new counsel would have properly advanced an advice of counsel defense such that the result at trial would have been different).

[185] Complaint ¶ 57.

Indalex to make an informed decision regarding the representation"[186] The Trustee,

therefore, can use violations of the Rules as evidence to support his claim of negligence

assuming he otherwise establishes the requisite standard of care.[187]

The question is: in the Fox Report, does Mr. Fox establish the standard of care for

negligence apart from the Rules? This determination is not easy because Mr. Fox's report is

a narrative making identification of his exact opinion(s) a challenge. Further, he appears to

give opinions, or at least make statements, on matters other than professional negligence.[188]

The Court has attempted to glean whether there is a basis for Mr. Fox's opinion(s)

other than the Rules. Some of his opinions, such as the obligation "to report up the ladder,"

the prohibition against doing business with a client, and impermissibly aiding and abetting a

fraud are clearly supported by citation to the Rules and non-Delaware case law, which in

certain instances cite to professional rules as guidance.[189] With one exception discussed

below, the only portion of the Fox Report that may arguably rely on a common law duty (as

well as the Rules) is titled "Representing Parents and Subsidiaries Concurrently Raises

Serious Conflicts of Interests." In this section, Mr. Fox uses the words "breach of loyalty"

and "duty of loyalty." But even in this section, he does not cite to Delaware (or even

Illinois) law to identify a common law duty, nor does he explicitly testify to a standard of

care apart from the Rules.

---

[186] Complaint ¶¶ 58, 60.

[187] *Dickerson v. Murray*, 2015 WL 447607, at *4 (Del. Super. Ct. Feb. 3, 2015) (recognizing that a claim of conflict of interest can pose liability on a negligence theory).

[188] For example, one of the headings in his report is: "The U.K. Subsidiary of Indalex Did Not Have Sufficient Surplus to Pay the Dividend." Fox Report 13 (Dkt. No. 70 Ex. 65) at A3011.

[189] *Id.* at 15–17, A3012–15 (reporting up the ladder, Rules 1.2 (a), (e), 1.13(b)–(c)); 11–12, A3009–10 (aiding and abetting a fraud, Rules 1.2(d), 4.1, 1.6)); 17–22, A3015–30 (doing business with a client, Rule 1.8); 7, 16, A3005, A3014 (*Antioch Litig. Tr. v. McDermott Will & Emery LLP*, 738 F.Supp.2d 758, 771 (citing to OHIO R. PROF'L CONDUCT 1.13(b) for quote cited in Fox Report).

Ultimately, the Court relies on Mr. Fox's own words in determining that the Fox

Report equates the standard of care with a violation of the Rules. Mr. Fox states:

> In response, [Kirkland] may assert that the rules of professional conduct are
> not interchangeable in every case with the standard of care for a professional
> negligence claim. *See* Ill. Sup. Ct. R. Prof'l Conduct, Scope [20]; Del. R.
> Prof'l Conduct, Scope 20. But that assertion fails to recognize key
> language, coincidentally originally drafted by the undersigned, that the
> breach of a rule can be evidence of professional negligence. *See* Ill. Sup. Ct.
> R. Prof'l Conduct, Scope [20]; Del. R. Prof'l Conduct, Scope 20. *In this
> case,* the conduct of [Kirkland] was so brazenly contrary to the rules of
> professional conduct that *the breach of those rules also violated the standard of
> care,* leading directly to the harm Indalex suffered. *In these circumstances,
> [Kirkland's] violations of the rules of professional conduct should give rise to civil
> liability.*[190]

There is only one way to read this paragraph: in his reports, Mr. Fox uses the Rules to

establish the standard of care. This is not permitted under Delaware law.

The only non-ethics based opinion in the Fox Report—that Kirkland's prior advice

regarding dividends established the standard of care governing Kirkland's representation

with respect to the Dividend—is equally unavailing.[191]  Delaware law establishes that the

standard of care for a legal malpractice case is the level of skill and diligence ordinarily

exercised by attorneys in the relevant community under similar circumstances.[192]  Without

---

[190] *Id.* at 25, A3023 (emphasis added). The Court notes that the Rules do not have the language
referred to in this quote. Further, it is not at all clear that Illinois law differs from Delaware law.
The Scope section of the Preamble to the Illinois Rules states: "Nevertheless, since the Rules do
establish standards of conduct by lawyers, a lawyer's violation of a Rule may be *evidence* of breach *of
the applicable standard of conduct.*" ILL. R. PROF'L CONDUCT pmbl. ¶ 20,
http://www.illinoiscourts.gov/SupremeCourt/Rules/Art_VIII/ArtVIII_NEW.htm
(emphasis added).
[191] Supplemental Report of Lawrence J. Fox 15 (Dkt. No. 73 Plaintiff's Ex. 49) at B465 ("[T]he
standard of care for declaring a dividend in this case was [also] established by [Kirkland] itself"
when it previously advised the Indalex board on the earlier dividend. "Kirkland[] fail[ed] to
conform to its own advice . . . ."); *see also* Answering Brief 34 ("Plaintiff's expert, Mr. Fox, evaluated
[Kirkland]'s conduct not only by the applicable Rules of Professional Conduct, but by [Kirkland]'s
own advice.").
[192] *See Beneville v. Pileggi*, 2005 WL 1026947, at *7 (D. Del. Apr. 22, 2005).

evidence of a recognized, standard practice, how a particular attorney, or subset of attorneys, have acted is irrelevant.

This principle is amply demonstrated by the Delaware District Court's decision in *Beneville v. Pileggi*.[193]  In this legal malpractice action, the court ruled after a three-day bench trial in which both the plaintiff/client and the defendant/law firm each put on the testimony of their respective expert witness regarding the alleged malpractice.  Plaintiff's expert, a local Delaware attorney, testified as to his own practice when engaged in a similar transaction as well as to what a lawyer might negotiate with a client regarding the lawyer's responsibilities in such a transaction.  But, he did not testify as to a recognized standard practice for commercial transactional lawyers in Delaware.[194]  Defendant's expert, another Delaware lawyer, testified as to the standard commercial practice in Delaware with respect to commercial transactions of the type at issue.  The District Court found the law firm's expert more persuasive, and in doing so, noted that the standard for a claim of legal malpractice is not a personal standard, but a recognized, standard practice for Delaware attorneys regarding the conduct at issue.[195]

As applied here, the Trustee's theory has two fatal flaws.  First, assuming that Kirkland's earlier advice perfectly emulated the correct standard of care, Mr. Fox did not provide expert testimony to that effect.  Second, even if Mr. Fox's report could be considered expert testimony on a standard of care based on this theory, it establishes only what Kirkland's personal standard was on one occasion.  It does not establish the standard

---

[193]  *Id.*

[194]  *See id.* ("[Plaintiff's expert] testified as to his own practice with little rationale.  He testified as to the standards that a lawyer might negotiate with his or her client, but did not testify to a recognized, standard practice for a commercial transaction for Delaware lawyers.").

[195]  *See id.*

practice of a Delaware attorney, or an attorney admitted in any state, regarding advice on special dividends or how to advise portfolio companies.  In short, and without more, Kirkland's prior advice cannot comprise the standard of care.

Had the Trustee provided an expert on the standard of care, Mr. Fox's expert opinion(s) that Kirkland breached the Rules could be introduced to bolster the Trustee's claims.  But, having failed to do so, Mr. Fox's reports do not save the Trustee from the entry of summary judgment against him.  Because the Trustee has failed to produce an expert on the pertinent standard of care, he has not presented a *prima facie* case for legal malpractice under Delaware law nor created an issue of material fact preventing summary judgment.[196]  Accordingly, summary judgment must be granted in favor of Kirkland on Count II.[197]

## IV.   The Aiding and Abetting Claim: Alternatively, Summary Judgment Is Not Granted on Count III of the Complaint for Failure to Proffer a Solvency Expert and Because There are Material Facts Exist as to Kirkland's Knowledge of any Breach of Fiduciary Duty

Under Delaware law, an aiding and abetting claim consists of four elements: (1) a fiduciary relationship; (2) a breach of fiduciary duty; (3) defendants' knowing participation in that breach; and (4) damages proximately caused by the breach.[198]  Kirkland argues that summary disposition is warranted because the Trustee cannot establish the second and third elements.  As to the second element, Kirkland claims that only a solvency expert can substantiate the underlying breaches alleged by the Trustee; therefore, the Trustee's failure

---

[196] *See Lorenzetti v. Enterline*, 2011 WL 5966726, at *3 (Del. Super. Ct. Nov. 7, 2011) (granting summary judgment where plaintiff failed to adduce a legal malpractice expert); *Gans v. Mundy*, 762 F.2d 338, 343 (3d Cir. 1985), *supra.*

[197] To be clear, the Court is not condoning Kirkland's conduct or blessing its establishment of PEFs; neither is the Court determining whether either was or was not a violation of the Delaware Rules of Professional Conduct.  The Court has simply found that the Trustee did not proffer an expert on the appropriate standard of care.

[198] *See Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001) (citing *Penn Mart Realty Co. v. Becker*, 298 A.2d 349, 351 (Del. Ch. 1972)).

to proffer an expert in this proceeding mandates judgment in Kirkland's favor.  Further,

notwithstanding its emphasis on expert testimony, Kirkland avers that additional

"undisputed evidence,"[199] including market valuations and reports, confirms that Indalex

was solvent in June 2007 and, as a result, it is clear that the Trustee cannot establish the

necessary underlying breaches.

As to the third element, Kirkland similarly contends that the Trustee has zero evidence

that it *knowingly* assisted Indalex in declaring an unlawful dividend.  Rather, what evidence

there is indisputably "shows that Kirkland had no knowledge, and no reason to believe, that

the [Dividend] would render Indalex insolvent."[200]  Accordingly, because the Trustee cannot

prove the second and/or third elements, the aiding and abetting claim must fail.

Significantly, the Trustee does not respond by arguing that expert testimony is

unnecessary with respect to insolvency.  Instead, the Trustee attempts to argue that not all of

his claims depend on insolvency and separately that Kirkland agreed, by virtue of its earlier

motion to stay, for the solvency issue to be conclusively decided in the Sun Adversary.[201]  In

addition, he claims that there is "ample" evidence of Kirkland's knowing participation,

including a Form 10-K drafted in part by Kirkland and filed in April 2007 for the year

ending December 31, 2006, that indicated Indalex may not be able to service its debt

---

[199] Kirkland cites the following as undisputed evidence demonstrating that the dividend did not render Indalex insolvent: the bonds traded above par after the dividend was issued, the company's first lien lenders permitted the dividend to be issued, its auditors determined after the dividend that the company would be able to continue as a going concern through 2008, independent market analysts affirmed that view, Indalex indeed continued to operate for more than twenty-two months after it paid the dividend, and management concluded, after a review of FTI's analysis, that Indalex would remain solvent following the payment of a much larger dividend.

[200] Memorandum in Support of Summary Judgment 35.

[201] *See* Answering Brief 24 ("[Kirkland]'s view fails to credit the fact that not all [of] the breach of fiduciary duty claims in the Sun Adversary and, therefore, not all [of] the aiding and abetting claims here, depend on solvency.  [Kirkland]'s position is also wrong since the underlying breaches of fiduciary duty will, by [Kirkland]'s own admission, be decided in the Sun Adversary.").

obligations, and certain language included the FTI Report that Kirkland insisted upon. The Court will proceed by addressing the Trustee's arguments in the order presented.

***The Court will not consider claims not pled in the Complaint***

As noted above, the Complaint depends on Indalex's insolvency for the aiding and abetting count. Put differently, the only breach of fiduciary duty alleged in the Complaint relates to the issuance of an unlawful dividend. Seemingly ignoring this self-imposed limitation, the Trustee now—for the first time—alleges that various transactions[202] attacked in the Sun Adversary form additional underlying breaches that support his aiding and abetting claim here. However, it is beyond peradventure that a plaintiff cannot expand or amend his complaint by a responsive pleading.[203] Because these allegations are beyond the scope of the Complaint, the Court cannot and will not consider them for any purpose.

***The Court will not grant summary judgment as a discovery sanction***

The Trustee similarly strains to argue that Kirkland's previous motion to stay should somehow be construed as an agreement to be bound by the district court's decision on Indalex's questioned solvency. This argument is rejected out of hand. Nowhere in the motion to stay does Kirkland agree to that. Rather, Kirkland merely requested (as indicated by the title of its pleading) a stay, or pause, in these proceedings in order for the Sun Adversary to play out. Moreover, the Trustee conveniently ignores the fact that he opposed the Kirkland motion to stay and prevailed. The Trustee thereafter did not attempt to withdraw the reference and consolidate the two cases, and, as such, they proceeded on their

---

[202] These transactions include the execution of a management services agreement between Indalex and Sun Capital, certain sale-leaseback undertakings Indalex completed in 2008, and two financial agreements documented as loans but characterized by the Trustee as equity infusions in disguise.
[203] *See, e.g., Bell v. City of Phila.*, 275 F. App'x 157, 160 (3d Cir. 2008) ("A plaintiff 'may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.'").

50

own separate tracks.   Accordingly, the Trustee was obligated to establish insolvency *in this case* and should have timely designated an expert in accordance with the approved scheduling order.   Either the Trustee mistakenly missed the deadlines or strategically opted not to engage in the process.   Either way, the Court soundly rejects the motion to stay argument.

Nonetheless, by virtue of the Trustee's motion to stay argument, he recognizes the significance of having a solvency expert testify on an issue that goes to the core of his aiding and abetting count.   As Kirkland states, "[w]ithout a solvency expert, plaintiff cannot prove that the Indalex directors breached a fiduciary duty when they approved the dividend and therefore he also cannot prove that Kirkland aided and abetted the supposed breach."[204] Again, the Trustee does not debate that proposition.   Although Kirkland has not cited any Delaware law *requiring* an expert, it takes very little to realize the eventual outcome if the Trustee cannot combat Kirkland's solvency expert with one of his own.   Kirkland agrees and specifically addressed the Trustee's inevitable evidentiary problems, asserting that the lack of a qualified expert would preclude the Trustee from "rebut[ting] the testimony of Kirkland's expert[,] who concluded that Indalex was solvent."[205]   Thus, if this Court refused to allow the Trustee to use or designate an expert it would essentially be granting summary judgment on the aiding and abetting count through a discovery sanction.

Whether to impose a discovery sanction tantamount to dismissal of the case is a question governed by the six-factor analysis set forth by the Third Circuit in *Poulis v. State Farm Fire & Casualty Co.*[206]   This Court has the discretion to grant dismissal when a party has

---

[204] Reply in Support of Summary Judgment 17.
[205] Memorandum in Support of Summary Judgment 32.
[206] 747 F.2d 863 (3d Cir. 1984); *see also Knoll v. City of Allentown*, 707 F.3d 406, 409 (3d Cir. 2013) (*Poulis* extends "beyond cases in which there [is] an *explicit* order of dismissal to those cases in which

failed to comply with its scheduling orders.[207]  Nonetheless, the Third Circuit has made clear

that dismissal is a "drastic" sanction only appropriate in "extreme" circumstances.[208]  To

help guide courts' discretion, the *Poulis* court enumerated the following factors:

> (1) the extent of the *party's* personal *responsibility*; (2) the *prejudice* to the
> adversary caused by the failure to meet scheduling orders and respond to
> discovery; (3) a *history* of dilatoriness; (4) whether the conduct of the party or
> the attorney was *willful* or in *bad faith*; (5) the effectiveness of sanctions other
> than dismissal, which entails an analysis of *alternative sanctions*; and (6) the
> *meritoriousness* of the claim or defense.[209]

As applied here, there is no suggestion or evidence by either party that the failure to

designate an expert by the applicable deadline was attributable directly to the Trustee rather

than his attorneys.  Considering the motion to stay motion theory, it is far more likely that

counsel was the source of this mishap or strategy.  Additionally, the question was not

whether to hire a solvency expert, as one was already retained for the Sun Adversary, but

instead the procedure for ensuring that that expert could testify in this case.  Under those

circumstances, proper compliance with civil procedure and prior scheduling orders clearly

was counsels' responsibility.

Turning to the second factor, it is clear that Kirkland suffered some prejudice as a

result of the discovery transgressions.  In particular, Kirkland's expert was forced to develop

his report without the opportunity to review an opposing report specifically submitted for

---

alternative sanctions [are] *tantamount* to dismissal"); *Beneville v. Pileggi*, 2004 WL 1631354, at *1
(D. Del. July 19, 2004) (applying *Poulis* in the context of a motion for summary judgment based on
the late disclosure of plaintiffs' expert report and where the absence of such testimony would
preclude plaintiffs, as a matter of law, from succeeding on their claim).
[207] *Beneville*, 2004 WL 1631354, at *1.
[208] *Poulis*, 747 F.2d at 867–68 (quoting *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639,
643 (1976)); *see also Emerson v. Thiel Coll.*, 296 F.3d 184, 190 (3d Cir. 2002) ("dismissal with prejudice
is only appropriate in limited circumstances and doubts should be resolved in favor of reaching a
decision on the merits.").
[209] *Poulis*, 747 F.2d at 868.

this case, as this Court's scheduling order provided for. Any expert designated now would still need to be deposed, his report assessed, and his opinions fully responded to. As such, Kirkland's expert likely would have no choice but to supplement and/or amend his prior report. This equates to added time and expense for Kirkland. The court can lessen that prejudice, however, by permitting the Trustee to designate only one specific expert—the expert designated in the Sun Adversary, an expert with which Kirkland is familiar by virtue of its role as counsel for Sun Capital in that case. Although that does not alleviate the Trustee's burden of having to prove insolvency in this case, Kirkland cannot reasonably argue that it would be blindsided by the Trustee using the same expert, given the nature of the claims in this case. To be clear, the Court is not suggesting that Kirkland should have responded to the Sun Adversary expert; nor is the Court implying that Kirkland should have acted to protect its own interests in the Sun Adversary. Rather, Kirkland's involvement in the Sun Adversary is simply a mitigating factor under the prejudice analysis.

With respect to the third and fourth factors, nothing in the record is sufficient to support a definitive finding that the Trustee's counsel has a history of dilatoriness in this adversary proceeding or acted wilfully or in bad faith.

With respect to the fifth factor, the Court finds that sanctions other than dismissal are appropriate and will effectively incentivize counsel to comply with future deadlines. In the event this decision is overturned and it becomes necessary to designate an expert in this case, the Court can assess costs, including attorneys' fees, attributable to the "lack of a solvency expert" portion of the briefing in support of the Motion.[210] And, the Court can

---

[210] Under Rules 16 and 37 of the Federal Rules of Civil Procedure, made applicable to these proceedings by Rules 7016 and 7037, the Court "is specifically authorized to impose on an attorney those expenses, including attorneys' fees, caused by unjustified failure to comply with discovery orders or pretrial orders." *Poulis*, 747 F.2d at 869.

require the Trustee or counsel, as appropriate, to bear the reasonable costs associated with Kirkland's expert having to amend his prior report in order to respond to the Trustee's designated expert. Lastly, Kirkland can be granted the opportunity to file a renewed motion for summary judgment after expert discovery solely on the issue of Indalex's solvency.

The final factor, meritoriousness, also weighs against dismissing the case. "In considering whether a claim . . . appears to be meritorious for this inquiry," the Court does not apply summary judgment standards.[211]  Rather, a claim is meritorious if the "allegations of the pleadings, if established at trial, would support recovery by plaintiff or would constitute a complete defense."[212]  Utilizing that standard, the Court finds that the aiding and abetting claim is meritorious.

As the *Poulis* court explained, "[d]ismissal must be a sanction of last, not first, resort."[213] and "[a]lternatives are particularly appropriate when the plaintiff has not personally contributed to the delinquency."[214]  After weighing the above considerations, and taking into account the Third Circuit's express admonition that "dismissal with prejudice is only appropriate in limited circumstances and doubts should be resolved in favor of reaching a decision on the merits,"[215] the Court concludes that granting Kirkland summary judgment based on the Trustee's lack of a solvency expert would be inappropriate at this time.

---

[211] *Poulis*, 747 F.2d at 869.
[212] *Id.* at 869–70.
[213] *Id.* at 869
[214] *Id.* at 866.
[215] *Emerson v. Thiel Coll.*, 296 F.3d 184, 190 (3d Cir. 2002).

*Material facts exist as to Kirkland's knowledge of any breach of fiduciary duty*

Finally, turning back to the third element of an aiding and abetting claim (defendants' knowing participation in the underlying breach of fiduciary duty), the Trustee has established a reasonable inference that Kirkland knowingly participated in the breach, assuming the Dividend actually rendered Indalex insolvent.  Knowing participation "requires that the third party act with the knowledge that the conduct advocated or assisted constitutes . . . a breach."[216]  The Court may infer such knowledge where the alleged aider and abetter gained an advantage from the board's breach of its duties.[217]  An inference is therefore appropriate here, where Kirkland's legal advice facilitated payment of a substantial dividend, part of which Kirkland partners ultimately received.  Accordingly, summary judgment is denied on this basis.

## CONCLUSION

For the foregoing reasons, the Court recommends that the district court enter summary judgment in favor of Kirkland and against the Trustee on both counts of the Complaint.

Dated:  September 28, 2016
        Wilmington, Delaware

LAURIE SELBER SILVERSTEIN
UNITED STATES BANKRUPTCY JUDGE

---

[216] *Gatz v. Ponsoldt*, 925 A.2d 1265, 1276 (Del. 2007) (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1097 (Del. 2001)).
[217] *Houseman v. Sagerman*, 2014 WL 1478511, at *9 (Del. Ch. Apr. 16, 2014).